[Civ. No. 4470. Fifth Dist. Aug. 27, 1979.]

In re TODD W., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
TODD W., Defendant and Appellant.

**COUNSEL**

Darryl S. Fried, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel Carey, J. Robert Jibson and Shirley A. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

DAVIS, J.*—Appellant, Todd W. (hereinafter Todd), 13 years old, admitted the allegations of a petition filed under Welfare and Institutions Code section 602, charging him with a violation of Vehicle Code section 10851 (auto theft).[1] At the October 5, 1978, dispositional hearing, the San Luis Obispo County Superior Court, sitting as a juvenile court, ordered Todd committed to the California Youth Authority (CYA) for a maximum term of three years. Todd's sole contention on appeal is that the trial court abused its discretion.

The acts forming the basis of the present petition occurred on September 13, 1978. On that date George Lane picked up Todd who was hitchhiking on Highway 37. Thereafter, Lane stopped the pickup truck and proceeded to its bed area to get some cigarettes. With Lane out of the cab, Todd slid over into the driver's seat and drove off. Lane jumped into the bed of the truck, from which location he tried, in vain, to persuade

---

*Assigned by the Chairperson of the Judicial Council.

[1]A second allegation of reckless driving, which arose from the same incident as the alleged auto theft, apparently was dismissed.

Todd to stop the vehicle. When Napa[2] Police Sergeant Moore saw the pickup run a stoplight, he activated his own lights and siren and began pursuit. A chase ensued during which the pickup exceeded 50 miles per hour. Ultimately the vehicle was stopped on a deadend road and Todd was arrested.

Proper analysis of the instant case requires a brief summary of Todd's prior record. The "Report of Probation Officer for Detention Hearing," dated September 22, 1978, reflects five contacts which resulted in "informal supervision." Four of these (occurring on or about Apr. 27, 1976, Oct. 13, 1976, May 29, 1977, and June 20, 1977) pertained to runaways.[3] A fifth contact, on September 29, 1976, pertained to an alleged violation of Vehicle Code section 10851. Neither the detention report above nor the "Dispositional Report of Probation Officer" (hereinafter dispositional report) contains any discussion as to the underlying facts of these five contacts.

On October 19, 1977, based on a petition filed September 23, 1977, Todd was declared a ward of the court, admitted to probation, and placed in a foster home. The original charge of violation of Vehicle Code section 10851 was amended to charge a violation of Penal Code section 499b (joyriding), which served as the jurisdictional predicate.

On October 25, 1977, a petition was filed alleging a violation on October 24 of Welfare and Institutions Code section 871 (escape). On November 9, 1977, Todd was continued as a ward and on probation and placed in a group home. On November 28, 1977, another escape petition was filed. This led to a December 9, 1977, order which continued probation and wardship, imposed a suspended CYA commitment, and placed Todd with his father.

The December 9 order followed the recommendation contained in a December 7, 1977, evaluation prepared by psychologist Bill Mosman. The Mosman report was based on several discussions with the probation officer, individual and joint personal interviews with Todd and his mother, projective and achievement tests, and a phone interview with Todd's father. Mosman concluded that Todd "demonstrates a very long

---

[2]The incident which serves as the basis to invoke the jurisdiction of the juvenile court occurred in Napa County. The case was transferred to San Luis Obispo County, the minor's residence.

[3]The report leaves unclear whether the above dates reflect the date of the alleged runaway incident or the date that a petition, if any, was filed.

history of antisocial thinking and antisocial types of orientation where he does not learn from experience, has little if any guilt, has very poor communicative skills, is impulsive, and really is basically concerned only with himself." Mosman suggested that Todd could be returned to his father with certain specified "safeguards." He expressed a less than 10 percent chance of success for this placement. Alternatively, Mosman suggested that the court consider CYA, which offered transactional analysis, which might help Todd's particular problems. Mosman acknowledged the risk that "he will pick up more bad habits in an institution than he came in with." No other alternatives were considered.

On June 6, 1978, Todd was placed in a foster home known as A Place in the Sun. The apparent basis for this change in placement was that the placement with Todd's father was unsuccessful.

On June 27, 1978, a petition was filed alleging a violation of Penal Code section 166, subdivision (4) (willful disobedience of any process or order lawfully issued by any court). On July 12, 1978, Todd was continued on wardship and probation, given another suspended CYA commitment, and again placed in the home of his father. The basis for this shift was that Todd was unamenable to treatment in A Place in the Sun. Todd ran away from his father's home and committed the instant offense.

The four-page dispositional report, prepared by Deputy Probation Officer James A. Tooley, recommended that Todd be committed to CYA. From the brief "family history" contained therein, it appears that he was the product of an unhappy marital relationship which "recently" ended in divorce. According to the report: "The relationship between the minor and his parents in the past as well as at present has been unsuccessful. At present, [Todd's mother] relates that she has been unable to negotiate any type of relationship with Todd on a meaningful and positive level. She states all relatives have attempted to help Todd, however, his reaction has been to steal and 'rip them off.' She also stated that the minor's father's physical and mental condition at this time would render him a doubtful placement for the minor as he is physically and mentally unable to effectively deal and cope with the minor. In the past, as previously noted, the relationship has been less than successful."

The analysis section of the report, which consists of less than one page, contains the reasons for the recommendation. It notes that "in a relatively short period of time he has developed a theft related history as well as a

history of failure in foster home and group home settings." The report indicated that Todd "poses a serious and real threat to the lives and safety of others in the community as well as their property." The report relied heavily on the December 7, 1977, Mosman evaluation.

On September 22, 1978, a lengthy dispositional hearing was held. The trial court heard testimony from Deputy Probation Officer Tooley, CYA liaison Kenneth Gunn, A Place in the Sun caseworker Cheryl Belch and Todd. Tooley testified that his CYA recommendation represented the unanimous position of the staffing committee of the probation office. Tooley summarized the reasons for his recommendation:

"A. [by Mr. Tooley] At this point I feel that Todd has exhausted or has been tried in a group foster home, as well as a foster home without success, meaning that the placement was a failure. To my knowledge, he has not demonstrated any commitment to making a positive change in his behavior. And on the occasion he comes to court now, the incident could have resulted in my opinion in injury to the victim or other people involved in Napa in his situation there. I feel that Todd is very closely coming to a point where he may either indirectly or directly hurt somebody, and I feel that at this point society and the community needs some protection from that element.

"Q. [by Todd's attorney] Okay. So, the primary basis then for your recommendation is that you feel Todd is a danger, a [sic] actual physical danger to society?

"A. I feel the potential has become much greater than in the past for danger, yes.

"Q. So, then you feel that C.Y.A. to protect society would be the best placement?

"A. That's right.

"Q. Are there any other reasons for recommending the California Youth Authority?

"A. No. That's the primary reason." Tooley acknowledged that, in the instant offense, Todd made "no direct effort" to injure the victim and the latter had jumped into the vehicle after he had started to drive off. The witness did not know why Dr. Mosman had not analyzed as an option a

county boys' ranch commitment, such as to Los Prietos Boys' Ranch in Santa Barbara County. Tooley was aware that Los Prietos had interviewed Todd, was willing to accept him pursuant to court order, and felt that a Los Prietos commitment could be beneficial to him.

The juvenile court was familiar with the Los Prietos program. According to the court, Los Prietos Ranch is part of the Santa Barbara County juvenile probation system and includes a school under the supervision of that county's board of education. The court characterized the academic program as "very close and concentrated . . . with remedial education being its main points." The camp consists of several buildings with the wards housed in a large dormitory which is locked at night. The camp is staffed by persons experienced in working with youth. Counseling is available through the Santa Barbara County Probation Department, though apparently not on a daily basis from a resident psychiatrist or psychologist. The court considered it a "very fine facility and should be utilized in the proper case." "However, the wards are allowed to work generally at the national forest or on the camp grounds themselves. There are no fences, gates or other restrictions other than a motivation to remain to prevent the ward from leaving the general area."

Tooley testified that, prior to the instant offense, Todd's problems, in part, had been runaway problems, although he "had some criminal matters that were not adjudicated in court."[4] Todd had never been involved in assaultive or violent behavior. Tooley would not characterize Todd as a sophisticated criminal. Todd had never been tried in a ranch or camp setting. Based on the trial court's description for the record of Los Prietos Ranch, Tooley testified that it would provide Todd with a confined setting, organized structure, a job or responsibilities, and counseling.

The probation office policy was not to recommend CYA placement unless all other alternatives were exhausted. The court noted that since October 31, 1977, a period in which the court handled 90 percent of all San Luis Obispo County juvenile cases, no 13 year olds had been sent to CYA. Tooley felt that, security considerations aside, Todd would benefit more from CYA than Los Prietos "on the basis of therapy, counseling." Tooley opined that, if sent to Los Prietos, Todd: "[P]robably would do okay the first couple of weeks because it is a new placement and it is a nice environment, physical setting, but I think there would be a time

---

[4]Tooley referred to alleged auto thefts in September and October 1976 and a firearm theft in November 1976. The facts of these offenses were not discussed.

where he would have to commit himself to a program. And there again, if it was not what he wanted, I think he would most likely run away from that program."

Kenneth Gunn, an employee of 19 years experience in the CYA, reviewed Todd's file and briefly talked to him. According to Gunn, in the fiscal year 1977-1978 the CYA accepted seven or eight 13-year-olds. The CYA does not normally accept 13-year-olds "because they feel that kids under 14 are too young to be exposed to the more sophisticated criminals that are in our institutions." As to those 13-year-olds accepted in the previous fiscal year, Gunn testified: "Generally more serious assaultive types of crimes against people and some just because they have posed a threat to crimes against people, generally very sophisticated delinquents who had exhausted all the facilities of the county."

Gunn opined that Todd would not be accepted by CYA for a regular commitment, but possibly might be accepted for a diagnostic evaluation. Nevertheless, Gunn felt, security factors aside, a CYA commitment would be more beneficial for Todd: "Personally, I think it's therapeutic for a youngster to know that there are limits and consequences to his behavior. And I think that he needs a locked facility to impress that upon him. That's a little bit different than just security, is what I'm saying. I think there is a therapeutic value to that."

Cheryl Belch testified that in her capacity as a caseworker for A Place in the Sun she had counseled Todd. A Place in the Sun was described as a satellite structure involving various group homes, each home being supervised by a parental figure. According to Belch, Todd "has a problem with his natural parental figures, and then he did show some problem with the group home figures in authority." The witness knew of no incidents of violence or assaultive behavior. She described him as "more confused than sophisticated," "mixed up because he doesn't really have any place definite that he feels like he belongs": "No. I mean that he is confused. I don't know if Todd had problems at that time with anuresis [sic] which shows emotional disturbance. He did show some problems with alcohol. I think these are all reflecting back just on his own personal confusion and sense of belonging."

The witness felt that Todd would benefit from a Los Prietos commitment and would not benefit from CYA. She acknowledged that while he was in his group home, his house parent reported an incident in which he had fired a .22-caliber weapon at some farm animals. On another

occasion, according to an earlier probation report, he consumed liquor belonging to his group home parents and poured the rest down the bathroom sink. The witness knew of no closed facilities where Todd could receive therapy, education and discipline other than CYA.

Finally, Todd testified that he would like to go to Los Prietos, that he did not think he would run from there, that he would be more comfortable in a setting where no one tried "to assume the mother and father role."

In reaching a disposition, the trial court indicated a concern with protection of the community and with Todd's need for discipline, remedial education, and treatment of emotional problems. The trial court expressed concern "at the lack of alternatives available to it," then noted that neighboring Santa Barbara County "does not have a secure locked facility which would contain Todd for such time as it's necessary to attract his attention, present to him a satisfactory program which would correct the defiant behavior which he has been consistently guilty of." The court added that "none of the other counties that have been explored have those facilities." The court rejected Los Prietos because it was not a locked, secure facility. Todd was thus committed to CYA.

## DISCUSSION

A decision of the juvenile court may be reversed on appeal only upon a showing that the court abused its discretion in committing a minor to CYA. (*In re Michael R.* (1977) 73 Cal.App.3d 327 [140 Cal.Rptr. 716]; *In re Willy L.* (1976) 56 Cal.App.3d 256, 265 [128 Cal.Rptr. 592].) We recognize "the general rule that an appellate court will not lightly substitute its decision for the disposition ordered by the juvenile court." (*In re James V.* (1979) 90 Cal.App.3d 300, 305 [153 Cal.Rptr. 334].) *In re Michael R., supra,* 73 Cal.App.3d 327 provides the applicable standard of review: " 'It is well settled in California that when a public offense has been committed by a juvenile, certification of the juvenile to the CYA is within the sound discretion of the committing court, be it the juvenile court . . . or the superior court . . . . [Citations.] The decision of the . . . court may be reversed on appeal only upon a showing that the court abused its discretion in committing the minor to the CYA. [Citations.] A reviewing court must indulge in all reasonable inferences to support the findings of the juvenile court, and such findings will not be disturbed on appeal when there is substantial evidence to support them. [Citation.]' . . . [¶] *In order to determine whether there was substantial evidence to*

*support this commitment, we must examine the evidence presented at the disposition hearing in light of the purposes of the Juvenile Court Law."* (*Id.*, at pp. 332-333; italics added.) (See also *In re Carrie W.* (1979) 89 Cal.App.3d 642 [152 Cal.Rptr. 690].) However, whether a commitment in a particular case conforms to the general purpose of the Juvenile Court Law is necessarily included when determining whether a commitment constitutes an abuse of discretion.

The general statutory purpose of "Juvenile Court Law" can be found in Welfare and Institutions Code section 202:[5] "(a) The purpose of this chapter is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the state; to protect the public from criminal conduct by minors; to impose on the minor a sense of responsibility for his own acts; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when necessary for his welfare or for the safety and protection of the public; and, when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes.

"(b) The purpose of this chapter also includes the protection of the public from the consequences of criminal activity, and to such purpose probation officers, peace officers, and juvenile courts shall take into account such protection of the public in their determinations under this chapter."

In referring to the CYA guidelines and criteria for commitment, our Supreme Court pointed out in *In re Aline D.* (1975) 14 Cal.3d 557 at pages 564-565 [121 Cal.Rptr. 816, 536 P.2d 65]: "As is evident from the applicable statutes, 'Commitments to the California Youth Authority are made only in the most serious cases and only after all else has failed.' (Thompson, Cal. Juvenile Court Deskbook, § 9.15, p. 123.) This concept is well established and has been expressed by the CYA itself. In light of the general purposes of juvenile commitments expressed in Welfare and Institutions Code section 502, discussed above, '. . . commitment to the Youth Authority is generally viewed as *the final treatment resource*

---

[5]Section 202, added by Statutes 1976, chapter 1068, sections 1.5 to 13, was formerly section 502, which was repealed by Statutes 1976, chapter 1068, sections 14 to 18.

available to the juvenile court and which least meets the description in the above provision [§ 502]. Within the Youth Authority system, there is gathered from throughout the State the most severely delinquent youths which have exhausted local programs.' (Italics added; California Youth Authority, Criteria and Procedure for Referral of Juvenile Court Cases to the Youth Authority (1971) p. 1.) [¶] . . . The 'Criteria' lists (at p. 2) several 'inappropriate cases' for commitment, including (1) *youths who are dependent or primarily placement problems*—'For these youths in need of a home and peer acceptance, as well as accepting adults, life in an institution might be totally fulfilling, resulting in an orientation to an institutional existence'; (2) *unsophisticated, mildly delinquent youths,* 'for whom commingling with serious delinquents who make up the bulk of the Youth Authority population might result in a negative learning experience and serious loss of self-esteem'; and (3) *mentally retarded or mentally disturbed youths,* 'for whom the probable benefits of treatment within the mental health system exceed those of programs within the Youth Authority . . . .' " (Italics in original.)

■ Commitment to the CYA should only be made in the more serious cases,[6] after all else has failed and as a last resort. (*In re Aline D., supra,* 14 Cal.3d 575; *In re Carrie W., supra,* 89 Cal.App.3d 642.) If a minor will not benefit from CYA commitment, and if no appropriate alternate placement exists, then the proceeding should be dismissed. (*Ibid.*)

■ Todd appears to fall within the criteria lists of inappropriate cases for commitment. Since the bulk of his juvenile record consists of runaway episodes, it is fair to classify him as primarily a placement problem. Both Probation Officer Tooley and counselor Belch testified that Todd was not a sophisticated criminal. His record of adjudicated and alleged, though nonadjudicated, criminality simply did not reflect criminal sophistication. Nor did it reflect violent or assaultive behavior. Finally, the record,

---

[6]For example, in *Carrie W., supra,* this court listed some examples of serious offenses: (1) robbery with great bodily harm coupled with a lengthy history of gang involvement and several prior violent crimes (*In re John H.* (1978) 21 Cal.3d 18 [145 Cal.Rptr. 357, 577 P.2d 177]); (2) 22 prior arrests, 6 of which were violent offenses, coupled with numerous prior ineffective placements (*In re Robert W.* (1977) 68 Cal.App.3d 705 [137 Cal.Rptr. 558]); (3) yelling at a teacher and being disruptive in school coupled with a prior record of grand theft and burglary (*In re Zardies B.* (1976) 64 Cal.App.3d 11 [134 Cal.Rptr. 181]); (4) criminally sophisticated pattern of delinquent behavior coupled with burglary and drug offenses (*In re Willie L., supra,* 56 Cal.App.3d 256); and (5) two rapes and oral copulation coupled with shoplifting, joy riding and possession of marijuana (*In re Clarence B.* (1974) 37 Cal.App.3d 676 [112 Cal.Rptr. 474]). (*Id.,* at p. 649.)

including the Mosman report, supports the view that Todd may be mentally disturbed. The court, Tooley, Belch and both counsel stressed Todd's need for psychological or psychiatric treatment. It might be noted that the file contains several references to a bedwetting problem, which underscores Todd's immaturity.

In addition, CYA liaison Gunn testified that, in his opinion, Todd would be rejected. Obviously, Todd's criminal profile bore no resemblance to the history of assaultive, violent behavior engaged in by the seven or eight 13-year-olds who formed the select group committed to CYA in fiscal year 1977-1978.

As recently stated in *In re Carrie W., supra,* 89 Cal.App.3d 642, 648: "We do not believe that the criteria for commitment to CYA includes the existence of a defiant, recalcitrant attitude displayed by a minor in this context when the commitment is predicated upon the probation department's frustration or sense of hopelessness in dealing with the minor after various other alternatives have been tried and have not been successful. It is quite apparent that the progressively more restrictive and punitive series of disposition orders contemplated by *In re Aline D.* is not intended to authorize the commitment to CYA merely because various local alternatives have been tried unless the underlying conduct upon which the commitment is based can be classified as being one of the more serious type cases (*In re Aline D., supra,* 14 Cal.3d at p. 564) for which commitment to the CYA 'as *the final treatment resource* available' (at p. 564) is justified."

While Todd's adjudicated criminal conduct was somewhat more serious than that in *Carrie W.,* and while we in no way condone it, the fact remains that auto theft is not "one of the more serious type cases" such that the trial court here was justified in bypassing a less restrictive and less punitive placement, such as Los Prietos Ranch. It is apparent that, because of prior unsuccessful placements, the trial court rejected out of hand Todd's testimony that he would not run away from Los Prietos. Nevertheless, Todd so testified and counsel Belch strongly supported such a commitment, while strongly opposing CYA.

The conclusion is compelled that appropriate CYA commitment standards were not applied, notwithstanding the trial court's pro forma finding that the commitment would benefit appellant.

That part of the judgment determining the court had jurisdiction is affirmed; that part of the judgment ordering commitment to CYA is reversed.

Brown (G.A.), P. J., and Franson, J., concurred.

A petition for a rehearing was denied September 20, 1979, and respondent's petition for a hearing by the Supreme Court was denied October 25, 1979. Clark, J., was of the opinion that the petition should be granted.