[Crim. No. 37198. Second Dist., Div. Four. Nov. 14, 1980.]

In re ANTHONY T., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY T., Defendant and Appellant.

[Crim. No. 38319. Second Dist., Div. Four. Nov. 14, 1980.]

In re ANTHONY T. on Habeas Corpus.

94

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and William T. Harter, Deputy State Public Defender, for Defendant and Appellant and Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Anthony D. Blankley, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MUNOZ, J.*—Appellant, Anthony T., appeals from the order of the juvenile court finding him to be a person coming within the provisions of Welfare and Institutions Code section 602 in that he committed two assaults with a deadly weapon, in violation of Penal Code section 245, subdivision (a), two robberies while using a firearm in violation of Penal Code sections 211 and 12022.5, and one robbery while armed in violation of Penal Code sections 211 and 12022. He has also filed a petition for habeas corpus which has been consolidated with this appeal.

We deny the petition for habeas corpus and reverse the order declaring him to be a ward of the court. Since two other issues are likely to arise should appellant be tried again, we discuss those issues first.

---

*Assigned by the Chairperson of the Judicial Council.

## FACTS

*Prosecution*:

On July 14, 1979, at about 11 p.m., a young man came up to the Jim Dandy Chicken Store on South Avalon in the County of Los Angeles and threatened the cashier, Ms. Dixon, with a gun. He stated he had a .32 and his friend had a .38.

After being admitted inside of the premises, the robber proceeded to the back room where he grabbed another employee, Mr. Forch, pointed the gun at Forch's head, and told Ms. Dixon to open the safe. Ms. Dixon indicated she could not open the safe and walked back to the front of the store. The two robbers left shortly thereafter taking $200 from the business, $35 from Ms. Dixon's purse, and $1 from Mr. Forch.

About two months later on September 8, 1979, at about 8 p.m., two robbers appeared at Pioneer Chicken on East Florence. Only one of the robbers was armed and he told the assistant manager, Mr. Bullock, to open the safe or his head would be blown off. He did so and gave the robbers about $720. After the robbery, appellant was identified as being the robber without the gun by Mr. Bullock and another employee. They knew it was appellant because appellant had been working at that same Pioneer Chicken for about three weeks prior to the robbery and had worked there the day before the robbery.

The next day appellant appeared at Pioneer Chicken and on the following Monday he came back to the store at the manager's request. He was arrested at that time.

*Defense*:

Appellant presented an alibi defense for the July 14 robbery; that he was at the Century Drive-In. His defense for the September 8 robbery was that he had not committed the robbery, had reappeared at the Pioneer Chicken on the next day, and had come to work on the Monday following the robbery knowing that the police would be there.

## THE IDENTIFICATION PROCEDURE

Shortly after the robbery of July 14 an individual named Randy, who had attended Markham Junior High with appellant,[1] came up to the

---

[1]Randy never testified nor did he appear at court. When offered a continuance to subpoena him to court, appellant declined.

manager of the Jim Dandy and showed her a picture of appellant that was contained in a yearbook. The manager brought the yearbook to Mr. Forch, apparently pointed out appellant's picture, and asked Mr. Forch, if appellant was the person who had committed the robbery. Mr. Forch answered in the affirmative. Later Mr. Forch had identified appellant from a photo lineup that was conducted after a live lineup.

Ladrena Dixon, another victim of the July 14 robbery, also knew Randy, who worked next door to the Jim Dandy. On the night of the robbery, she saw him drive up just prior to the robbery. The next day, Randy talked to her but he did not show her any pictures of appellant. She heard the name Anthony T. "Through the streets, everybody was saying he is who had robbed us." Later a police officer brought her a Markham Junior High School yearbook and asked if she recognized anyone on a particular page. When the officer showed her the yearbook, he did not cover up the names on the pages. Later she went to a lineup and identified appellant.

At trial, both Ms. Dixon and Mr. Forch identified appellant as the robber and both testified that they were relying on what they remembered of the incident, not on the basis of the photographs they had seen.

At the conclusion of the hearing, counsel argued the identification by Ms. Dixon should be suppressed because of the identification procedure used. In answering, the court stated: "...we will make a finding for the record that I find that the identification made by Miss Dixon was certainly tainted. The in court identification was certainly tainted. However, I feel that the People subsequently, with the testimony of both direct and cross of Miss Dixon after the discovery of this original taint, that is the year book procedure, removed the taint insofar as the court was concerned and I will deny [the] motion as to Miss Dixon."

Appellant now argues that there was no evidence to indicate the taint was removed. Were appellant correct in his argument, it would be difficult, if not impossible, to remove the taint that the court indicated had occurred in the courtroom. (See, e.g., *Gilbert* v. *California* (1967) 388 U.S. 263, 272 [18 L.Ed.2d 1178, 1186, 87 S.Ct. 1951]; *People* v. *Martin* (1970) 2 Cal.3d 822 [87 Cal.Rptr. 709, 471 P.2d 29].) However, a fair reading of the court's comments makes it clear that the court misspoke itself when it indicated the taint had reached the courtroom. What the court obviously meant to state, and what everyone else appar-

ently understood the court to mean, was that the original identification procedure had been overly suggestive; therefore, it was up to the People to prove the primary illegality had not been exploited and that the in-court identification had an independent origin. (See, e.g., *United States v. Wade* (1967) 388 U.S. 218, 241 [18 L.Ed.2d 1149, 1165, 87 S.Ct. 1926].)

Resolution of the meaning of the court's comments does, however, bring up the overriding issue of whether the pretrial identification procedure was so overly suggestive that it tainted any subsequent identifications of appellant.

In *Simmons* v. *United States* (1968) 390 U.S. 377, 385 [19 L.Ed.2d 1247, 1254, 88 S.Ct. 967], the court held that identification by photographs will only be set aside when the photographic procedure is so impermissibly suggestive so as to give rise to a substantial likelihood of irreparable misidentification. In *Neil* v. *Biggers* (1972) 409 U.S. 188, 194 [34 L.Ed.2d 401, 408, 93 S.Ct. 375], the court stressed that the evil sought to be avoided was the very substantial likelihood of misidentification.

Five years later, in *Manson* v. *Brathwaite* (1977) 432 U.S. 98, 114 [53 L.Ed.2d 140, 154, 97 S.Ct. 2243], the court stressed that "reliability is the linchpin in determining the admisibility of identification testimony . . . ." In determining the all important question, the court set forth a balancing test composed of various factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the prior description of the criminal; (4) the level of certainty demonstrated at the identification; (5) the time between the crime and the identification;[2] and (6) the first five items were to be weighed against the corrupting effect of the suggestive identification itself. (432 U.S. at pp. 114-116 [53 L.Ed.2d at pp. 154-155].) Finally, the court stressed that short of a likelihood of irreparable misidentification, the question is for the jury: "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (432 U.S. at p. 116 [53 L.Ed.2d at p.155].)

---

[2]In *Manson*, the court used the term "confrontation," but the facts and the discussion make it clear that the court was discussing the identification as opposed to a live confrontation.

Here the very nature of the identification was such that it called for a determination by a trier of fact. The police were not the ones who began spreading the rumor throughout the neighborhood that appellant was the robber. Likewise, it was not the police who came up to Mr. Forch, showed him appellant's picture, and asked if appellant was the robber. But, if appellant was wrongfully identified and convicted it matters not to him whether the injustice was due to the actions of the private citizens or the police; the injury to him is the same. (Compare, *People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396].) The trier of fact found the People had shown that any corrupting effect of the identification procedures had been purged and had no bearing on the in-court identifications. We have examined the total record and agree with the determination of the trier of fact. Thus, we need not resolve the thorny problem of whether the actions of private citizens could foreclose the People from using any identification testimony.[3]

██ Here both Mr. Forch and Ms. Dixon were robbed at gun point and were in the robber's presence for about 15 minutes. During that time, the robber threatened both witnesses and placed a gun to the head of Mr. Forch, indicating that if Ms. Dixon did not open the safe he would kill Mr. Forch. The identification by both victims was within a day or two of the robbery and both were positive when they observed appellant's picture. At trial both were positive as to their identification of appellant.

Finally, we have examined the yearbook that was shown to the witnesses. On page 29, the page on which appellant's picture appears, there are 52 separate photographs. Forty-eight of those pictures, of which one is appellant's picture, are arranged in six vertical rows of eight across. To the right of the last picture, the name of every person in that row is in small type. Thus, it was possible to look at the pictures without seeing the names; but, it was equally possible to glance over to the names on the right and then come back to the picture associated with that name. At trial, there was no showing that Ms. Dixon, who knew appel-

---

[3]Trial counsel, unlike appellant's counsel, felt that there would be no due process violations if "State action" were not involved. He stated to the court: "With Mr. Forch, the photo was pointed out, not by a member of the police force or by the district attorney, so it wouldn't pursue the denial of due process on those grounds. However, I would suggest that the credibility, the reliability of his information, of his identification should be questioned, even though there may not be any involvement in denial of due process."

lant's name, looked at his name before she saw his picture. Had she done so, this might have made the taint impossible to purge. The evidence failed to establish this fact and this court must presume she looked at the pictures without associating the picture with the name at the end of the row. Accordingly, the taint of the identification procedure as to Ms. Dixon was slight. Given the totality of the circumstances and based upon a review of the record and the evidence, we conclude that there was no likelihood of irreparable misidentification. (*Manson* v. *Brathwaite, supra,* 432 U.S. at pp. 114-116 [53 L.Ed.2d at pp. 154-155]; *In re Cindy E.* (1978) 83 Cal.App.3d 393 [147 Cal.Rptr. 812].)

In his supplemental habeas corpus petition, appellant has added a declaration concerning the composition of the photographic lineup that was shown to Ms. Dixon and Mr. Forch. No attempt has been made to attack the effectiveness of the representation which appellant received at the trial level. (See *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal. Rptr. 732, 590 P.2d 859].) The additional facts raised by the declaration attached to the petition are not sufficient to grant him relief. (*In re Wright* (1978) 78 Cal.App.3d 788, 802-803 [144 Cal.Rptr. 535].) The petition for writ of habeas corpus will be denied.

### THE PROPRIETY OF THE YOUTH AUTHORITY COMMITMENT

■ Appellant next contends the trial court abused its discretion in committing him to the California Youth Authority because this was the first time he had been made a ward of the court and less Draconian measures had not yet been tried. (See *In re Jose P.* (1980) 101 Cal. App.3d 52 [161 Cal.Rptr. 400]; *In re Aline D.* (1975) 14 Cal.3d 557 [121 Cal.Rptr. 816].) Respondent counters by arguing that recent cases have clearly shown that if the crime is serious enough, the court may commit a minor to the Youth Authority even if he has never been in trouble before.

In *In re John H.* (1978) 21 Cal.3d 18, 27 [145 Cal.Rptr. 357, 577 P.2d 177], the court considered almost the identical contention as that set forth by appellant. In rejecting the argument, the court stated: "Appellant further contends that, under *Aline D.* a commitment to the Youth Authority should never be ordered until 'less restrictive' placements have been attempted. To the contrary, *the circumstances in a particular case may well suggest the desirability of a Youth Authority commitment* despite the availability of such alternative dispositions as

placement in a county camp or ranch. [Citations.] *Aline D.* stressed the importance of finding a probable benefit to the minor before a Youth Authority commitment can be upheld. . . ." (Italics added.) Here appellant was involved in two separate robberies in which firearms had been involved. In both cases threats were made on the lives of the victims and in both cases appellant placed a gun to the neck or head of the victims. A slip or sudden movement and appellant might well be before this court after having been tried and convicted of first degree murder as an adult. (See Welf. & Inst. Code, § 707 et seq.) Additionally, the trial court was made aware of the fact that appellant had quit going to school even though he had the ability to earn good grades.

Based upon the above and other factors, the trial court sent appellant to the Youth Authority pursuant to Welfare and Institutions Code sections 707.2 and 1731.6 for a diagnostic study. The Youth Authority also recommended appellant be committed to the Youth Authority and further found appellant was amenable to Youth Authority treatment. The staff psychologist concluded appellant needed to complete high school, establish good work habits and vocational training. Upon being returned to juvenile court, the probation officer recommended Youth Authority placement. Finally, the court concluded: ". . . this is a very capable, very manipulative, very sophisticated personality that needs direction and he has demonstrated that without it he can be extremely violent and commit extremely serious offenses. I think that it is necessary, both for the safety of the community and for the benefit of the minor, therefore, that he be removed from his home and that he, in fact, be committed to the California Youth Authority, where there is the long-term type of programs available to allow him to complete his education and, perhaps, go into the service, which I think would be an excellent idea in his case, in any event, equip him with some kind of tools to allow him to be a productive citizen in the community at a point now where it is absolutely critical to him. He is at the age of 17. He is going to be an adult. It is possible for him to put this entire matter behind him by completing the program at the California Youth Authority.

"However, when he becomes an adult if this kind of conduct should continue, he would have to look forward to years in prison. The program at the California Youth Authority is considerably shorter. Therefore, I am going to follow the recommendation of the reports." There was no abuse of discretion in committing appellant to the Youth Authority.

## THE ADJUDICATION PROCEDURE

After the parties had rested and finished their respective arguments, the following occurred: "THE COURT: Well, this is probably the most difficult case I have had to deal with in terms of evidence and credibility of witnesses.

"I believe everybody in his debt earnest [*sic*] testified in this case with the possible exception of the minor. It does present a conflict in common sense or logic in that in the one instance you have a minor here who evidences no conduct associated with guilt in either one of these instances. Also, however, if he did commit the September 8 robbery that would be consistent with committing the July 14th robbery, but the September 8 robbery defies common sense again...."

█ Both sides agree that the trial court considered both cases in deciding appellant's guilt as to each. Respondent contends that since both crimes were charged offenses, the court could properly consider both offenses at the same time in considering the guilt of either. That is not the law. █ "Each count in a pleading charges a separate and distinct offense and stands upon its own merits. If one falls its failure does not affect the course taken upon the remaining counts and their strength and the force of the evidence produced as proof of them cannot give support to one whose proof is lacking...." (*People* v. *Coakley* (1951) 108 Cal.App.2d 223, 229-230 [238 P.2d 633].)

Respondent further contends that in any event the two offenses could have been admissible in the trial of the other had each count been tried separately. (*People* v. *Thomas* (1978) 20 Cal.3d 457 [143 Cal.Rptr. 215, 573 P.2d 433].) Therefore, respondent argues the fact that they were tried together should not make any difference in the analysis and result. Respondent's argument presupposes too much. Had this been a crime involving sex, both crimes might have been admissible in the trial of the other. (See, e.g., the conc. opn. of Justice Kaus in *People* v. *Wills-Watkins* (1979) 99 Cal.App.3d 451, 457 [160 Cal.Rptr. 289].) █ But, in this case the crimes were robbery, the issue was identity of the perpetrator, and the crimes were not so similar that it can be said that whoever did the first necessarily did the second. (See *People* v. *Haston* (1968) 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91].) Respondent has not indicated any factors that would make the two crimes so distinctive. As appellant states, about the only similarities were that a gun was used in the robbery of two chicken take-out

stands in two months. This state has liberal joinder provisions in order to avoid "needless harassment of the defendant and the waste of public funds which may result if the same general facts were to be tried in two or more separate trials...." (*People* v. *Brock* (1967) 66 Cal.2d 645, 655 [58 Cal.Rptr. 321, 426 P.2d 889]; Pen. Code, § 954.) However, the pursuit of judicial economy and efficiency may not be used to deny a defendant his right to a fair trial. (See, e.g., *People* v. *Duane* (1942) 21 Cal.2d 71, 76-77 [130 P.2d 123]; *People* v. *Chambers* (1964) 231 Cal. App.2d 23 [41 Cal.Rptr. 551]. See also *Drew* v. *United States* (D.C. Cir. 1964) 331 F.2d 85.) Here that occurred when the trial court used each robbery in deciding whether appellant was guilty of the other. The prejudice to appellant was stated by the court when it indicated the case was close. Thus, it is readily apparent that a different result would have been more probable had the error not occurred. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

The order appealed from is reversed. The petition for habeas corpus is denied.

Kingsley, Acting P. J., and McClosky, J., concurred.

A petition for a rehearing was denied December 3, 1980.