[Civ. No. 5513. Fifth Dist. Mar. 4, 1981.]

In re ANTHONY M., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY M., Defendant and Appellant.

COUNSEL

Renee H. Hoffman, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, and James T. McNally, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**ZENOVICH, Acting P. J.**—This appeal involves two issues: (1) whether sufficient evidence supported the determination that appellant Anthony M. (hereinafter Anthony) committed a burglary, and (2) whether the juvenile court abused its discretion in committing Anthony to the California Youth Authority (hereinafter CYA).

A subsequent petition was filed in juvenile court charging Anthony, a 16-year-old minor, with one count of burglary (underlying felony of grand theft) in violation of Penal Code section 459; and one count of violating a previous court order and condition of probation to "obey all laws." He denied the allegations contained in this petition.

Following a jurisdictional hearing, the court found the allegations of the subsequent petition to be true. The court committed Anthony to CYA for the maximum term of three years on the burglary count and ran the sentence on the second count concurrently with the first. Anthony appeals from the commitment order.

## JURISDICTIONAL HEARING

At about 2:28 a.m., January 31, 1980, Modesto Police Officer Luciano Beltran received a call to respond to a silent alarm at Needham Liquors. When approximately 100 yards from the store, he observed a suspect, John Webb, standing in front of the store, looking around. Webb ran back into a nearby alcove; Beltran informed the dispatcher of a possible burglary. He parked his patrol car about 50 feet west of the store and observed two subjects running from the alcove. Beltran instructed them to halt. Webb complied with his command, although Anthony continued to run in a northwesterly direction from Beltran.[1] The officer again requested Anthony to halt; appellant fell down, "got up and started running again." Beltran testified that Anthony ran across Orange Avenue "and I last saw him on the west side of [the street] still running in a northerly westerly direction." The officer then placed Webb under arrest. He also dispatched Anthony's description and information about the direction of his flight. Soon thereafter, Beltran was informed by radio that two officers had the fleeing suspect in custody. He drove to the area of detention and identified Anthony as the individual he had seen leaving the liquor store.

Modesto Police Officers David Huckaby and Joseph Aja were dispatched to the liquor store as a backup unit. After consulting with Beltran about the direction of the suspect's flight, the officers walked around the vicinity of the liquor store, checking the houses on the west side of Orange Street. They went into an alley and observed two gates open alongside the residence located at 133 Orange Street. Huckaby walked to the back area of the residence and found Anthony lying on the ground under a tall bush. Huckaby noticed that Anthony was still breathing heavily. Subsequently, the officer took the minor into custody.

Officer Aja then returned to the liquor store. He noticed that the front door had been pulled open and that a padlock was lying on the floor about three feet inside the store. The two round eye bolts for the door's padlock had been torn open, and the top and bottom door latches had been damaged. Aja entered the store and noticed a bottle of Creme de Cacao on the counter by the cash register.

---

[1]Beltran stated he was able to "clearly" observe Webb and Anthony on the morning in question.

Raymond Pifer, an employee at Needham Liquors, locked the store and set the alarm at 11 p.m. on January 30, 1980. He stated no bottles were left on the counter that evening. Pifer identified the bent padlock found by Aja as the type used at the liquor store. He further indicated that the front door would have to be opened in order to activate the store's silent alarm.

Anthony testified in his own behalf. Anthony testified that he was bowling and drinking heavily with John Webb on the evening of January 30. He stated that he drank about a quart of Seagram's Seven with Webb. Anthony also said he drank about a six-pack of beer at the bowling alley. He did not remember anything from the time at the bowling alley until the next morning, when he woke up in juvenile hall.

## DISPOSITIONAL HEARING

A comprehensive social study was submitted at the dispositional hearing. The study reflected that Anthony had the following prior record:

August 9, 1978, Stanislaus County Juvenile Court, drunk in public. At this time the minor was declared a ward of the court and released to his grandparents under terms of probation.

October 4, 1978, Stanislaus County Juvenile Court, auto theft. The minor's wardship was continued and the minor was released to his mother's custody under terms of probation which included a 69-day juvenile hall commitment, with 15 days suspended on the condition he abide by his terms of probation, and 24 days credit for time served. Also, 30 days of this commitment were to be fulfilled in the alcoholism treatment program as an inpatient.

December 21, 1978, Stanislaus County Juvenile Court, burglary. The minor's wardship was continued, and the minor was released to his mother under terms of probation which included a 73-day term in Stanislaus County Juvenile Hall with 30 days suspended on the condition he abide by his terms of probation and he was to receive 43 days credit for time served.

March 22, 1979, Stanislaus County Juvenile Court, drunk in public and resisting arrest. The minor's wardship was again continued and the

minor was released to his grandparents under standard terms of probation which included a 90-day commitment to the Stanislaus County Juvenile Hall with 30 days suspended on the condition he abide by terms of his probation. The minor was directed to participate in the inpatient program at the alcoholism treatment center for 30 days.

April 25, 1979, Stanislaus County Juvenile Court, burglary. The minor's wardship was again continued and the minor was removed from his parents' custody and ordered to be placed in a suitable forestry camp.

September 20, 1979, Stanislaus County Juvenile Court, violation of probation, as the minor ran away from a receiving home pending placement in the camp. The minor was continued as a ward and was committed to camp as previously ordered.

August 6, 1979, the minor was placed at Robert K. Meyer's Youth Center in Visalia, California. On January 17, 1980, the minor completed the camp program of Robert K. Meyer's and was released to his guardians under terms of probation.

Anthony also made a statement to a probation officer which was included in the social study. The minor indicated that his alcohol problem stemmed from family problems produced by his parents' divorce. Anthony stated that: "[After the divorce,] I needed someone around the house but there was no one there, and I did not feel like my mom could help me with my problems so I could not get my feelings out and I got more depressed and it built up inside of me and I decided I did not want to live at home because we were not getting along so I ran away and went to live with a friend of mine and it did not work out there so I went back home."

He told the probation officer about consuming alcohol since the fourth grade. Anthony also conceded using marijuana, acid, and speed in combination with alcohol. He reported being under the influence of alcohol at every instance of arrest for a law violation. Anthony also urged that he be committed to a camp rather than CYA. He specifically stated: "I know alcoholism isn't an excuse for committing a crime but if I wasn't under the influence of alcohol I would have not committed the crime to begin with. I would like to have one more chance. I would like some kind of treatment for my alcohol and drug problem, I know I

am looking at the California Youth Authority for the crime I did and I probably deserve it. But I would like one more chance at camp. And about the crime, the reason I just didn't plead guilty is because I just don't know if I did it or not. I can't say if I did do it or I didn't do it. I'm 16 years old and my life has been a big turn-around since I began drinking alcohol and taking drugs and I don't know what I am going to do about it. I am leaving it up to you for what I am going to do with my drinking problem."

Anthony's grandparents, Mr. and Mrs. Northern, made the following pertinent remarks in the dispositional study: "They reported the minor was released from the camp on January 17, [1980,] and upon his release he began associating with older peers. They know of the minor getting drunk twice since his return from camp. He also stayed away from home all night on one occasion. They feel the minor uses alcohol every chance he gets. However, when the minor is not under the influence of alcohol, they report that he behaves and obeys them and is very polite and obedient around the home. They also report the minor was under the influence of drugs or alcohol when he has been in Court for law violations in the past. . . . They feel the minor's drinking problem may have stemmed from parental neglect. . . . The minor does not care to see his parents as he feels his parents do not care about him. . . . Mr. and Mrs. Northern also reported the minor was given a chance to have alcohol counseling at the Alcoholism Treatment Program but the minor only spent two days there and left the program. They do not feel the minor will stay in that program for any length of time. They also report the minor becomes hot tempered when he receives a lecture on his drinking problem or when he fails to get his way."

Doug Dewar, probation supervisor for Anthony during his forestry camp stay, indicated that "The minor performed satisfactor[ily] in forestry camp but had a great deal of trouble dealing with other wards in the program. It appears that his grandparents are unable to offer adequate supervision for the minor. Since his release was just prior to committing the last offense, I feel a commitment to the California Youth Authority is appropriate."

In addition, the Stanislaus Resource Review Board recommended that Anthony be committed to CYA.

The probation officer penning the dispositional study also recommended CYA commitment. The following reasons for such a suggestion

were enumerated by the officer: "First, the minor has been unable to function within the community under terms of probation. The records at the probation department clearly indicate that the minor was not abiding by his terms of probation. He was given, in the past, extensive commitments in juvenile hall when he was released on probation. Second, he was committed to a forestry camp and, even though he completed the camp program satisfactorily, it appears it did not have any rehabilitative impact on the minor. He became involved in this offense approximately two weeks after his release from the camp. Third, the minor refused the counseling offered by the local Alcoholism Treatment Program. He only stayed in the program two days and decided to run away from the program. His grandparents feel he will not stay at such a program on his own free will. Fourth, the minor has admitted to abusing alcohol and drugs in combinations. Fifth, the minor is purely a danger to the property of others. He has continued to involve himself in law violations where he has taken other people's property. Sixth, even if the minor were to be placed in a 727c type of placement, it is felt he will not be able to make any necessary adjustment in such a placement." The officer concluded his recommendation by noting that CYA offered the best place for Anthony because (1) it was a securely locked facility, (2) the minor could receive the aid of CYA drug and alcohol programs, and (3) he would have an opportunity to learn a trade.

At the dispositional hearing, the court indicated that it had read and considered Anthony's social study. Anthony's counsel relayed that the minor believed "an alcohol program at the camp facility would be best for him," notwithstanding his prior record of unsuccessful placement. In response to this request, the court noted the following in committing Anthony to CYA:

"That [the fact that Anthony failed to attend prior alcohol counseling] is an important thing insofar as the Court is concerned. If this were a case of the first time the minor has been before the Court on an alcohol abuse problem and had not had an opportunity to correct the situation I would agree with [Anthony's counsel] that this minor should be given a chance to correct his drinking problem and get it resolved in a camp setting. But, number one, he has been to camp. He has rejected one alcoholic abuse program. And I have no reason to conclude now he has seen the light and that he is going to do it under these circumstances. I think in the Probation Officer's report, which is a well reasoned report for the reasons given therein, I can see no alternative

but to commit this minor to the California Youth Authority. And I do that for the following reasons:

"It's obvious and apparent to the Court that the minor cannot function in this community under terms and conditions of probation. That he has an extensive record and his being released to probation certainly couldn't be the answer.

"Secondly, he has had a prior commitment to forestry camp. Although, he was committed there it, apparently, did no good because this offense was committed some two weeks after his release from camp. So, obviously, the camp commitment was not rehabilitate [*sic*] in its effort.

"And, thirdly, he has previously refused counseling offered by the local alcoholic treatment program. It's obvious that his grandparents cannot control him. And he has a drug abuse problem and an alcoholic abuse problem.

"And finally, due to the nature of the offenses here and his past record, it's apparent to the Court that it's a danger to the person and property of others, not necessarily person, but property of others and protection of the minor that he be placed in a locked facility where he can undergo some intensive rehabilitative processes."

I

Anthony initially contends insufficient evidence supported the trial court's implied finding that he participated in the burglary of Needham Liquors. Specifically, Anthony notes no evidence showing that he either engaged in preparatory acts to committing a felony or entered the liquor store. We are not persuaded.

■ In reviewing the conclusions of the juvenile court, this court views the evidence in the light most favorable to respondent and presumes in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*In re Roderick P.* (1972) 7 Cal.3d 801, 808-809 [103 Cal.Rptr. 425, 500 P.2d 1]; *In re Charles G.* (1979) 95 Cal.App.3d 62, 66-67 [156 Cal.Rptr. 832].) ■ The People can use circumstantial evidence to prove that a defendant participated in a burglary. (*People* v. *Naughton* (1969) 270 Cal.App.2d 1, 7-8 [75 Cal.Rptr. 451]; see also *People* v. *Sotelo* (1971)

18 Cal.App.3d 9, 19-20 [95 Cal.Rptr. 486].) Prosecution witnesses do not need to actually see the defendant break and enter into the premises. (*People* v. *Hinson* (1969) 269 Cal.App.2d 573, 577 [75 Cal.Rptr. 223].) An unexplained flight is evidence of participation in a burglary. (*People* v. *Martin* (1969) 275 Cal.App.2d 334, 339 [79 Cal.Rptr. 769].) Furthermore, in showing that a defendant entered the premises with felonious intent, the People can rely upon reasonable inferences drawn "from all of the facts and circumstances disclosed by the evidence," since felonious intent is rarely proven through direct evidence. (*People* v. *Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752]; *People* v. *Walls* (1978) 85 Cal.App.3d 447, 452 [149 Cal.Rptr. 460].) Since burglary arises when the person makes entry with the requisite felonious intent, it is irrelevant that the felony was not subsequently completed. (*People* v. *Bard* (1968) 70 Cal.2d 3, 5 [73 Cal.Rptr. 547, 447 P.2d 939].) Moreover, evidence of flight from the scene of a burglary supports a reasonable inference that an intent to commit theft was existent. (*People* v. *Smith* (1978) 78 Cal.App.3d 698, 704 [144 Cal.Rptr. 330].)

■ With these principles in mind, substantial evidence in the record showed that Anthony participated in the burglary and possessed the requisite felonious intent for the crime. Officer Beltran observed Webb and Anthony running from Needham Liquors; upon his command to stop, Webb did so, although Anthony continued his flight. Two other officers subsequently found Anthony hiding under a bush in the yard of a residence near the liquor store. He was breathing heavily at the time. Beltran identified Anthony as the person who continued to run away from the store. An employee of Needham Liquors identified the bent padlock found inside the store and stated that no liquor bottles were left on the counter after lockup on the evening of January 30. Nonetheless, a bottle of Creme de Cacao was later noticed on the counter by an investigating officer.

We are of the opinion that the evidence amply establishes the reasonable inferences that Anthony was a participant in the burglary and that he entered the premises for purposes of stealing liquor. Although there was no direct proof of preparation or entry, the evidence of flight and discovery of a hyperventilating Anthony in a nearby yard adequately links the minor as a participant in the burglary. Furthermore, the circumstantial proof of flight, coupled with the presence of the liquor bottle on the counter, constitutes solid evidence from which an inference of intent to commit grand theft could be drawn by the juvenile court.

Thus, upon an examination of the total record, we find there was sufficient evidence supporting the lower court's finding that Anthony committed a burglary.

## II

Anthony then contends that the juvenile court abused its discretion in committing him to CYA for a three-year term. We disagree.

■ "The decision of the juvenile court may be reversed on appeal only upon a showing that the court abused its discretion in committing the minor to CYA. An appellate court will not lightly substitute its decision for that of the juvenile court, as the former must indulge in all reasonable inferences in support of the latter's decision and will not disturb it unless unsupported by substantial evidence." (*In re Eugene R.* (1980) 107 Cal.App.3d 605, 617 [166 Cal.Rptr. 219]; accord *In re Reynaldo R.* (1978) 86 Cal.App.3d 250, 256 [150 Cal.Rptr. 71]; *In re Gregory S.* (1978) 85 Cal.App.3d 206, 212 [149 Cal.Rptr. 216].) ■ Notwithstanding the fact that CYA is treated as a placement of last resort, the circumstances in a particular case may well suggest the desirability of a commitment despite the availability of such alternative dispositions as placement in a county camp or ranch. (*In re John H.* (1978) 21 Cal.3d 18, 27 [145 Cal.Rptr. 357, 577 P.2d 177].) *John H.* mandates that there at least be a finding of probable benefit to the minor before a Youth Authority commitment can be upheld. (*Ibid.*; accord *In re Anthony T.* (1980) 112 Cal.App.3d 92, 99-100 [169 Cal.Rptr. 120].)

The courts have consistently indicated that CYA commitment is usually not justified by the seriousness of a current offense alone[2]—i.e., unaccompanied by a history of criminal conduct or serious delinquent behavior. (See, e.g., *In re Jose P.* (1980) 101 Cal.App.3d 52, 58-59 [161 Cal.Rptr. 400] (two car thefts); *In re Todd W.* (1979) 96 Cal. App.3d 408, 411-412, 418 [157 Cal.Rptr. 802] (auto theft with prior record of joyriding and placement violations); *In re Carrie W.* (1979) 89 Cal.App.3d 642, 648-649 [152 Cal.Rptr. 690] (obtaining telephone services by fraud with prior record of petty thefts, truancy and disobedience of superior's orders).)

[2]We recognize, however, that the circumstances of some offenses may evidence a disregard for life, and that such conduct justifies a CYA commitment. For example, it would be anomalous if juvenile courts were precluded from considering Youth Authority placement for a youth who had deliberately planted explosives which seriously injured or killed other individuals.

In the absence of an accompanying past criminal record or serious delinquent conduct, CYA commitment should not be selected unless alternative placement options are adequately explored. (*In re Aline D.* (1975) 14 Cal.3d 557, 567 [121 Cal.Rptr. 816, 536 P.2d 65].) Finally, the courts have also shown a persistent concern for committing young, unsophisticated youths or aliens with individuals who are experienced, sophisticated, criminally oriented types. (See *In re Jose P., supra*, 101 Cal.App.3d at p. 55 (15-year-old Mexican alien who was committed with no consideration of rehabilitation alternatives); *In re Todd W., supra*, 96 Cal.App.3d at pp. 418-419 (unsophisticated and possibly mentally disturbed 13 year old); *In re Carrie W., supra*, 89 Cal.App.3d at pp. 647-648 (a lonesome, unmarried, pregnant 15-year-old girl in an institutional setting over 100 miles from her close familial relationships).)

■ The record here amply supports the juvenile court's decision to commit Anthony to CYA.

Although not involving assaultive or violent behavior, Anthony's prior record reveals a consistent pattern of delinquent activity. Anthony had committed two previous burglaries, was detained for being publicly drunk on two prior occasions, had committed a previous auto theft, and was found guilty of resisting arrest during one of the above incidents. Similar conduct by delinquent juveniles has been upheld as the type of behavior justifying CYA commitment. (See, e.g., *In re Eugene R., supra*, 107 Cal.App.3d 605, 617-618 (commitment justified by progressive criminality of prior record, ineffectiveness of alternative rehabilitative placements, and juvenile's violent and hostile behavior); *In re Zardies B.* (1976) 64 Cal.App.3d 11, 15 [134 Cal.Rptr. 181] (current offenses of threatening a school employee and being disruptive at school; prior record indicating commission of a grand theft and burglary); *In re Willy L.* (1976) 56 Cal.App.3d 256, 263-264 [128 Cal.Rptr. 592] (pattern of delinquent behavior, including burglary and drug offenses); see also *In re Robert L.* (1980) 112 Cal.App.3d 401, 408 [169 Cal.Rptr. 354] (contempt for the life and property of others and the need for long-term treatment in a secure, structured setting, among other factors).)

Moreover, contrary to Anthony's assertion indicating otherwise, the juvenile court either did weigh less restrictive dispositions or, in the alternative, correctly concluded that such options were not viable.

The statement by Anthony's grandparents in the social study reflected that he had not engaged in *voluntary* alcohol counseling at the alcoholism treatment program, although he was directed to participate in it as a term of his probation on two occasions. The grandparents also noted, "They do not feel the minor will stay in that program for any length of time" and "the minor becomes hot tempered when he receives a lecture on his drinking problem or when he fails to get his way."

Doug Dewar, Anthony's supervisor at the forestry camp, stated that he had "trouble dealing with other wards" in the forestry camp program. Dewar also reported that Anthony's grandparents offered inadequate supervision. He recommended CYA commitment because Anthony committed the latest burglary soon after his release from camp.

The Stanislaus Resource Review Board agreed with the recommendation to commit Anthony to CYA. Furthermore, the probation officer who wrote the social study recommended Youth Authority commitment, placing emphasis upon the following facts: (1) commission of the instant burglary two weeks after release from the forestry camp; (2) refusal to participate in the local alcoholism treatment program; and (3) propensity to be a danger to the property of others. The probation officer also opined that Anthony would not be able to make the necessary adjustment "in a 727c type of placement."[3] The court also heard Anthony's request to be placed in a county camp with an alcohol rehabilitation program.

Based on the foregoing information, the juvenile court determined that CYA commitment would be "in the best interest, welfare, and protection of Anthony." In doing so, the court stressed Anthony's prior record, the ineffectiveness of forestry camp rehabilitation (as evidenced by the commission of the burglary two weeks afterwards), Anthony's refusal to voluntarily attend a local alcohol counseling program, lack of control by his grandparents, and his danger to the property of others (necessitating "that he be placed in a locked facility where he can undergo some intensive rehabilitative processes"). Also significant is the

---

[3]The probation officer was referring to Welfare and Institutions Code section 727, subdivision (1)(c), which provides that a court may commit a minor to "the probation officer, to be boarded out or placed in some suitable family home or suitable private institution, subject to the requirements of Chapter 3 (commencing with Section 1500) of Division 2 of the Health and Safety Code;..."

fact that the court had earlier stated, "If this were a case of the first time the minor has been before the Court on an alcohol abuse problem and had not had an opportunity to correct the situation I would agree...that this minor should be given a chance to correct his drinking problem and get it resolved in a camp setting."

The record shows CYA commitment was made after a thorough consideration and rejection of existing rehabilitative alternatives. Since the court carefully concluded that such commitment would be in Anthony's "best interest" and would provide a secure facility where he could "undergo some intensive rehabilitative processes," there was no abuse of discretion in the instant commitment. (Cf., *In re Jesse McM.* (1980) 105 Cal.App.3d 187, 192-193 [164 Cal.Rptr. 199].)

Anthony's reliance upon *In re Aline D., supra,* 14 Cal.3d 557 is misplaced. In that case, our Supreme Court reversed a CYA commitment order because (1) the record contained psychiatric recommendations that the minor not be committed to CYA, and (2) the referee's in-court statements disclosed a substantial *dissatisfaction* with a CYA commitment. (*Id.,* at pp. 561-562.) Instead, our high court stated the juvenile court must be "fully satisfied" that a CYA commitment will benefit the minor. (*Id.,* at p. 562.) Moreover, the Supreme Court noted that "The unavailability of suitable alternatives, standing alone, does not justify the commitment of a nondelinquent or marginally delinquent child to an institution primarily designed for the incarceration and discipline of serious offenders." (*Id.,* at p. 567.) *Aline D.* is distinguishable from the instant situation in several regards: (1) several individuals[4] and the circumstances in the case itself suggested that CYA commitment was the appropriate placement option; (2) the benefit of a long-term commitment to CYA (rather than the unavailability of suitable alternatives) was the basis of the juvenile court's decision; and (3) there was no indication Anthony possessed the mental disturbance which concerned the court in *Aline D.*

Since the facts and circumstances here indicate the propriety of CYA commitment (*In re Gregory S., supra,* 85 Cal.App.3d at p. 213), we find that the juvenile court did not abuse its discretion.

---

[4]The individuals recommending placement in the Youth Authority included Doug Dewar, the Stanislaus Resource Review Board, and the probation officer penning the social study.

The judgment is affirmed.

Hanson (P. D.), J., and Thompson, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 29, 1981.

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.