[Civ. No. 4208. Fifth Dist. Feb. 22, 1979.]

In re CARRIE W., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
CARRIE W., Defendant and Appellant.

COUNSEL

Michael L. Hanks, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, George Deukmejian, Attorneys General, Jack R. Winkler, Robert H. Philibosian, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General Nelson P. Kempsky and Charles P. Just, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BROWN (G. A.), P. J.—Appellant, Carrie W., a 16-year-old minor, admitted the allegations of a petition filed under Welfare and Institutions Code section 602,[1] charging her with violation of Penal Code section 502.7, subdivision (a)(1) (obtaining telephone services by fraud). ■ ■ ■ At the dispositional hearing held June 15, 1978, she was committed to the CYA for a maximum term of three years.[2] She appeals, challenging her commitment to the CYA.

The acts forming the basis of the present petition occurred between July 30, 1977, and November 24, 1977, while Carrie was residing at the Florence Crittenton home for unwed mothers in Los Angeles pursuant to a placement order by the Kern County Juvenile Court. She was then 15 years old. During this period she placed unauthorized long distance telephone calls to her boyfriend (44 times), her mother (11 times), her aunt (4 times), her probation officer (1 time) and friends (51 times), totaling $338.53 in charges. She admitted that she made the calls "on whims" almost every day despite frequent warnings not to and even after her telephone privileges had been suspended. At the insistence of her social worker, appellant paid $50 of the money she earned while at Crittenton to the telephone company.

---

[1]All references to codes are to the Welfare and Institutions Code unless otherwise indicated.

[2]In passing we note the length of the commitment was unauthorized. The maximum period of imprisonment sanctioned by Penal Code section 502.7 is one year and one day. A minor cannot be committed to the Youth Authority for a period in excess of the maximum term of imprisonment which could be imposed upon an adult convicted of the same offense. (§§ 726, 731; *In re Samuel C.* (1977) 74 Cal.App.3d 351, 356 [141 Cal.Rptr. 431].)

Her child was born on November 19, 1977. On January 13, 1978, she went home to Bakersfield on leave and refused to return to Crittenton. Between that date and the current commitment to the CYA on June 15, 1978, a period of five months, she remained at home with her child, living with her mother and five siblings, and so far as appears on the record she was involved in no delinquent or criminal behavior.

Carrie had been a ward of the juvenile court since July 14, 1975, and spent two short periods in the Kern Youth Facility in 1976 for petty thefts. She was placed in a foster home in January 1977 but after a short period left there without permission to return home. In addition the probation report reflects that before July 14, 1975, she had been detained, admonished and released for two alleged petty thefts and a malicious mischief charge.

Carrie's mother and father are divorced. Her mother is ill and a welfare recipient. She is close to her mother, who feels Carrie should remain at home and take care of her baby. The home is a three-bedroom rented house in the lower socioeconomic area of southeast Bakersfield.

During Carrie's stay at Crittenton she showed marked improvement in her school performance, had little difficulty in the parent-child care programs and showed significant improvement in her peer relationships. The flavor of these improvements can be fully appreciated only by quoting from the clinical presentation reports of November 29, 1977, and January 23, 1978 (closing summary). Pertinent extracts are attached as appendix "A."

The probation officer's reports submitted at the time of the dispositional hearing made the following observations:

"The minor is responsible for the care of her six month old daughter and is neither working nor attending school. Carrie has advised this officer that she feels nothing should be done to her as she hopes to 'pay back the money.' She has not attempted to pay back any money nor has she looked for employment in the interim period (January, 1978 to the present). Carrie does not feel that she should be forced to do anything against her wishes. It appears that Kern Youth Facility commitments, foster home, and facility placements have not been effective in the rehabilitation of this minor. Carrie is an intelligent young lady but appears to have no desire to benefit by the opportunities presented her. A Youth Authority commitment is felt to be appropriate in this case."

"However, the minor has exhibited an attitude of defiance during the several months of placement and has disregarded reprimands administered by this officer and Lee Pipes, the minor's social worker.

". . . . . . . . . . . . . . . .

"Carrie's past history appears to be filled with defiance of authority and determination to do her own thing.

". . . . . . . . . . . . . . . .

"Carrie, being an obstinate and strong-willed young lady, is determined to behave as she pleases irregardless [*sic*] of orders given by the Court or the rules and regulations given by those who are in authority."

## DISCUSSION

Section 202 (formerly 502), quoted in the margin,[3] sets forth in broad terms the general purposes of the Juvenile Court Law. Amplification of the legislative intent in enacting the law is found in a number of cases. ■ It is settled that the law is designed for the purpose of rehabilitation and treatment, not punishment. (*In re Michael R.* (1977) 73 Cal.App.3d 327, 333-334 [140 Cal.Rptr. 716].) The courts have persistently shown a realistic concern for commingling of unsophisticated, mildly delinquent minors "with the more criminally oriented groups of delinquents committed to California Youth Authority," thereby converting them to trained and sophisticated criminals. (*In re Maria A.* (1975) 52 Cal.App.3d 901, 903 [125 Cal.Rptr. 382].) The premier case authority is *In re Aline D.* (1975) 14 Cal.3d 557 [121 Cal.Rptr. 816, 536 P.2d 65], in which our Supreme Court set forth the appropriate guidelines.

" 'The statutory scheme . . . contemplates a progressively restrictive and punitive series of disposition orders in cases such as that now before us—namely, home placement under supervision, foster home placement,

---

[3]Section 202 provides: "(a) The purpose of this chapter is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the state; to protect the public from criminal conduct by minors; to impose on the minor a sense of responsibility for his own acts; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when necessary for his welfare or for the safety and protection of the public; and, when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes.

"(b) The purpose of this chapter also includes the protection of the public from the consequences of criminal activity, and to such purpose probation officers, peace officers, and juvenile courts shall take into account such protection of the public in their determinations under this chapter."

placement in a local treatment facility and, as a last resort, Youth Authority placement.'

"As is evident from the applicable statutes, 'Commitments to the California Youth Authority are made only in the most serious cases and only after all else has failed.' (Thompson, Cal. Juvenile Court Deskbook, § 9.15, p. 123.) This concept is well established and has been expressed by the CYA itself. In light of the general purposes of juvenile commitments expressed in Welfare and Institutions Code section 502, discussed above, '. . . commitment to the Youth Authority is generally viewed as *the final treatment resource* available to the juvenile court and which least meets the description in the above provision [§ 502]. Within the Youth Authority system, there is gathered from throughout the State the most severely delinquent youths which have exhausted local programs.' [Citation.]" (At p. 564.)

Referring to the CYA guidelines and criteria, the court quotes with approval: "The 'Criteria' lists (at p. 2) several 'inappropriate cases' for commitment, including (1) *youths who are dependent or primarily placement problems*—'For these youths in need of a home and peer acceptance, as well as accepting adults, life in an institution might be totally fulfilling, resulting in an orientation to an institutional existence'; (2) *unsophisticated, mildly delinquent youths,* 'for whom commingling with serious delinquents who make up the bulk of the Youth Authority population might result in a negative learning experience and serious loss of self-esteem'; . . ." (*In re Aline D., supra,* 14 Cal.3d at pp. 564-565.)

■ In our view it would be difficult to conceive of a delinquent profile that more neatly fits the Supreme Court's classifications (1) (primarily placement problem) and (2) (unsophisticated, mildly delinquent youth) than does Carrie.

She has not been involved in any aggressive, destructive or assaultive conduct nor in criminal activities more serious than petty theft, truancy and disobedience of superior's orders—none of which under the circumstances of their commission in this case can be classified as anything other than mildly delinquent behavior. The commitment to CYA was unnecessary to protect the public against such comparatively innocuous activity. As to the instant offense, considering the trying conditions under which the unauthorized calls were made, we are unimpressed with the contention that it was serious criminal conduct. While unauthorized use of the phone in the face of a prohibition to do so is not to be condoned or

excused, the conduct can certainly be understood, having been committed as it was by a lonesome, unmarried, pregnant 15-year-old girl in an institutional setting over 100 miles from her mother and siblings with whom she apparently had a close familial relation and to whom she longed to return. It is significant that shortly after the infant was born the telephone calls ceased.

As has been discussed, there is no indication on the record of any criminal or delinquent behavior during the five months she was home between January and June of 1978. It would appear that the birth of her child had some effect on her behavior. There is no indication that either the probation officer or the court gave any consideration to what effect the birth of the child had upon Carrie's propensity for irresponsible conduct.

It is also noted that though the telephone calling terminated in November 1977 and Carrie left Crittenton in January 1978, the petition herein was not filed until April 26, 1978, apparently because Carrie failed to follow through on restitution and do certain other things which the probation officer felt she should do, such as reenter school or become employed. Considering her age and natural maternal feelings, it would appear that she could have had an understandable desire to stay home and take care of her child.[4]

We do not believe that the criteria for commitment to CYA includes the existence of a defiant, recalcitrant attitude displayed by a minor in this context when the commitment is predicated upon the probation department's frustration or sense of hopelessness in dealing with the minor after various other alternatives have been tried and have not been successful. It is quite apparent that the progressively more restrictive and punitive series of disposition orders contemplated by *In re Aline D.* is not intended to authorize the commitment to CYA merely because various local alternatives have been tried unless the underlying conduct and juvenile record upon which the commitment is based can be classified as being one of the more serious type cases (*In re Aline D., supra,* 14 Cal.3d at p. 564) for which commitment to the CYA "as *the final treatment resource* available" (at p. 564) is justified. That is clearly not the situation here.

---

[4]Neither does the probation report nor the court comment upon or deal with the obvious traumatic result to both mother and child of separating the mother from the child. This should be an important consideration, particularly in light of section 202 setting forth a dominant purpose of the act as being to keep the family together and to preserve and strengthen family ties.

A review of the cases in which CYA commitments have been affirmed reveals that all involved delinquent conduct far more serious than that demonstrated by Carrie. (See, e.g., *In re John H.* (1978) 21 Cal.3d 18 [145 Cal.Rptr. 377, 577 P.2d 177] [current offense consisted of robbery during which great bodily injury inflicted on the victim; record revealed lengthy history of gang involvement and several prior violent offenses]; *In re Robert W.* (1977) 68 Cal.App.3d 705 [137 Cal.Rptr. 558] [record revealed 22 arrests (6 involving crimes of violence), numerous ineffective prior placements, recommendations of CYA commitment]; *In re Zardies B.* (1976) 64 Cal.App.3d 11 [134 Cal.Rptr. 181] [current offenses were yelling at teacher and being disruptive at school; record revealed grand theft and burglary]; *In re Willy L.* (1976) 56 Cal.App.3d 256 [128 Cal.Rptr. 592] [record revealed serious pattern of delinquent behavior, including major burglary and drug offenses]; *In re Clarence B.* (1974) 37 Cal.App.3d 676 [112 Cal.Rptr. 474] [current offense involved two rapes and an act of oral copulation; record revealed involvements in one incident of shoplifting, three incidents of joyriding, and an incident of possession of marijuana].)

■ We are, of course, aware that a juvenile court's commitment to the CYA can only be reversed for an abuse of discretion, and in evaluating the evidence and making that determination an appellate court must apply the substantial evidence test. (*In re Willy L.* (1976) 56 Cal.App.3d 256, 265 [128 Cal.Rptr. 592].) However, whether a commitment in a particular case conforms to the general purposes of the juvenile court law is necessarily included when determining whether a commitment constitutes an abuse of discretion. (See *In re Michael R.* (1977) 73 Cal.App.3d 327, 333-335 [140 Cal.Rptr. 716].) ■ For the reasons we have set forth, on this record the conclusion is compelled that appropriate standards for commitment to the CYA were not applied, notwithstanding the court's pro forma finding that the CYA commitment would be of benefit to Carrie.

That part of the judgment determining the court had jurisdiction is affirmed; that part of the judgment ordering commitment to the California Youth Authority is reversed.

Hopper, J., and Creede, J.,* concurred.

A petition for a rehearing was denied March 16, 1979, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied April 19, 1979.

---

*Assigned by the Chairperson of the Judicial Council.

Appendix "A"

Extracts From Clinical
Presentation Reports of November 29, 1977,
and January 23, 1978 (Closing Summary)

Although these reports are not part of the clerk's transcript they are part of the original file which we have had transmitted to this court and they were part of the court record referred to by counsel and the court at the time of the disposition hearing.

In the report dated November 29, 1977, it is stated:

"Carol's adjustment to Florence Crittenton has been quite good though she has experienced some difficulty returning from passes on time. Carol's peer relationships are appropriate and she has been able to demonstrate caring feelings and anger and disappointment appropriately. Carol has established some close peer relationships and has also been able to relate well with staff. . . .

". . . [Carrie's mother] is an ailing woman and is disabled due to a diabetic condition. Carol is very attached to her mother and siblings and has quite an extended family (some of whom reside in the Los Angeles area).

"Carol had a healthy daughter a week and one-half ago and she is doing very well adjusting to her new role. Since her return from the hospital (11-21-77) she has managed to maintain a routine, take care of herself, and consistently care for her child. She is exhibiting appropriate anxiety of a new mother and asks appropriate questions. She was a consistent participant in the pre-natal class and is now a participant in the mother's group which occurs weekly.

"Carol's school performance is very good. . . .

"Carol's group performance is very good. She is a consistent participant and is able to exhibit concern and caring feelings. She is somewhat inhibited when it comes to role playing which speaks to her discomfort in acceptance.

"The goal for Carol to return to Bakersfield is a prevalent issue of Carol's. She is continually concerned about the length of time required before returning to her mother's home. . . . The current feeling is that separation of mother and child would be very detrimental to both their well beings, and that every effort should be made to continue them in placement."

The report dated January 23, 1978 (closing summary) states in pertinent part:

"Carol seemed continually homesick and, yet, she would verbalize her desire to complete vocational training at Florence Crittenton as well as her desire that her mother relocate to a larger home. Carol seemed unable to view herself in the future as independent. She feels she will need to care for her mother as her younger brothers grow up. This inability to separate is possibly due to guilt feelings Carol may have because she is away from her mother. . . .

". . . . . . . . . . . . . . . . . . .

"Carol is an appealing young lady who is able to function with minimal limit setting in an open placement. . . . Carol's self concept has not developed to its fullest and with continued counseling and support this seems possible. She has potential to be a supportive, firm young mother and this should be enhanced by further instruction and supervision. Separation from her infant is not recommended because she is still in the early phase of relationship building and she may learn to rely too heavily on another (possibly her mother). . . . She refused offers to use an agency phone once-a-week to call home. It seemed that she needed the almost daily contact with those in Bakersfield."

The reports also indicate that Carrie has a poor self-image, is manipulative and somewhat secretive and was suspected of lying about others. She was persistently a day or more late in returning to Crittenton after going home on passes. The report indicates there were reciprocal charges of petty thievery between Carrie and her fellow residents.