[No. F010669. Fifth Dist. July 17, 1989.]

In re LORENZA M., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
LORENZA M., Defendant and Appellant.

**COUNSEL**

Donna L. Hall, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael J. Weinberger and Ruth M. Saavedra, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**STONE (W. A.), J.—**

### Statement of the Case

Appellant, Lorenza M., admitted the allegations of a petition filed pursuant to Welfare and Institutions Code section 602 in the Tulare County juvenile court charging a violation of Vehicle Code section 10851, taking a motor vehicle without the permission of the owner. The Tulare County court transferred the matter to juvenile court in Fresno after it was ascertained she was a resident of Fresno County. At the disposition hearing the court declared the offense to be a misdemeanor and committed her to California Youth Authority (CYA) for one year. She appeals, challenging the propriety of her commitment.

### Statement of Facts

On June 13, 1988, Lorenza and four other girls took a van belonging to Sequoia Youth Services, the group home in which the girls had been placed. They returned with the van three days later, at which time Lorenza was arrested.

Lorenza's first encounter with juvenile authorities was in 1976 when she was removed from her mother's custody and placed in a foster home. She has remained a dependent child of the juvenile court and has been placed in several foster homes, with her mother, with her maternal grandparents and in three different group homes.

In September 1986 she was placed on supervised probation pursuant to Welfare and Institutions Code section 654 for taking her grandfather's car without his permission. According to the probation officer's report, she frequently ran away from her grandparents' home, did not obey her grandfather, had been suspended from school and did not complete the five days of community service work which was a condition of her probation.

In December 1986, a petition was filed alleging battery, and Lorenza was declared a ward of the court. The court committed her to the Ashjian Treatment Center where she was to obtain mental health counseling. She failed to complete the counseling that had been arranged.

In March 1987 she was placed in juvenile hall for violating probation. She had run away from her grandparents' home and had failed to attend school and to obey her grandfather. Because of apparent emotional problems, the

court ordered her to participate in the Athena program at juvenile hall. In May 1987 the court again committed her to Ashjian Treatment Center for attempted vehicle theft.

At the disposition hearing for the instant petition the juvenile court stated its belief that Lorenza was not a criminal but that she was unhappy. However, the court was of the opinion that every reasonable alternative available in Fresno County had been exhausted. With respect to the various alternative placements, it stated: "She has gone through the Athena Program which is the longest commitment we have here, and is an outstanding program. She has been in placement for substantial period of time and from this report this Court's conclusion is that there is no family resources to which the Court can turn to provide care, custody and control. And that this Court is not prepared to just place her in a revolving cycle of group home placements even though those don't seem to be meeting her needs.

"I think she's unhappy and I don't think they were meeting her needs and I'm not criticizing you for that. On the other hand I feel there are programs at the California Youth Authority from which she can benefit. And I think she needs a period of time where she can obtain some work on her education and develop some structure within her life and some controls."

Lorenza's grandfather requested that Lorenza not be punished further, that she be given another chance in his home and that her mother be given an opportunity to care for her when her mother was released from prison the following month. The court responded that it understood that she had suffered but that she needed to mature in a more wholesome environment with which she had not yet been provided.

In committing her to CYA, the court found as follows: "I've considered all local less restrictive programs and forms of custody and I'm satisfied that they're inappropriate dispositions and that she can benefit by the programs offered by the Youth Authority.

"I've considered her mental and physical condition and qualification and in spite of her age and which she's very young, she has—she seems bright and demonstrated maturity beyond her years. And I find it is such that it renders it probable that she will be benefitted by the reformatory, educational discipline offered by the Youth Authority."

DISCUSSION

 Lorenza contends she was not a proper candidate for CYA given her age and her mild history of delinquency. According to Lorenza, the

court abused its discretion by committing her to CYA because she was a "placement problem." Respondent contends the court did not abuse its discretion since the court based its decision upon its finding that Lorenza would probably benefit from a CYA commitment and that other less restrictive alternatives had been exhausted.

■ "The decision of the juvenile court may be reversed on appeal only upon a showing that the court abused its discretion in committing a minor to CYA. (*In re Eugene R.* (1980) 107 Cal.App.3d 605, 617 [166 Cal.Rptr. 219]; *In re Todd W.* (1979) 96 Cal.App.3d 408, 416 [157 Cal.Rptr. 802].) ■ An appellate court will not lightly substitute its decision for that rendered by the juvenile court. We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them. (*In re Eugene R., supra,* at p. 617; *In re Michael R.* (1977) 73 Cal.App.3d 327, 332-333 [140 Cal.Rptr. 716].) ■ In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law. (§ 200 et seq.; *In re Todd W., supra,* at pp. 416-417.)" (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395 [234 Cal.Rptr. 103].)

■ The essence of Lorenza's argument is that the record does not support her commitment to CYA in light of the purposes of the Juvenile Court Law. To support her claim of abuse of discretion, she relies upon *In re Aline D.* (1975) 14 Cal.3d 557 [121 Cal.Rptr. 816, 536 P.2d 65], and two cases out of this court—*In re Carrie W.* (1979) 89 Cal.App.3d 642 [152 Cal.Rptr. 690] and *In re Todd W.* (1979) 96 Cal.App.3d 408 [157 Cal.Rptr. 802]. In order to fully understand the issue, we review briefly the pertinent statutes and case law concerning the juvenile justice system and CYA commitments beginning with *In re Aline D., supra.*

At the time the Supreme Court published *In re Aline D.,* the general purposes of the juvenile justice system, as contained in former section 502 of the Welfare and Institutions Code, were to " 'secure for each minor . . . such care and guidance, preferably in his own home, as will serve the . . . welfare of the minor and the best interests of the State; . . . and when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents.' " (*In re Aline D., supra,* 14 Cal.3d at p. 562.) Juvenile commitment proceedings were designed for the purposes of rehabilitation and treatment, not punishment. (*Id.* at p. 567.) With these purposes and goals in mind, the court noted that a CYA commitment could not be made unless the court ordering such a commitment was " '. . . *fully satisfied* that the mental and physical condition and qualifications of the ward are such as

to render it *probable that he will be benefited* by the reformatory educational discipline or other treatment provided by the Youth Authority.'" (Italics in original.) (*Id.* at p. 562, quoting from Welf. & Inst. Code, § 734.)

It was in this context that the Supreme Court was confronted with the circumstances of Aline D., a borderline mentally retarded girl with a history of assaultive behavior and gang affiliation which had resulted in her placement in several group homes as well as several temporary commitments to juvenile hall. Everyone seemed to agree that Aline was not an appropriate candidate for CYA, but the juvenile court referee was unable to find other, more appropriate alternatives and was unwilling to dismiss the case and return Aline to the streets. Aline was committed to CYA solely because the referee felt he had no options. (*In re Aline D., supra,* 14 Cal.3d at pp. 561-562.)

In reversing, the Supreme Court spent a great deal of time examining the criteria for CYA commitments and CYA statistics regarding wards committed to its facilities. The court relied upon expressed guidelines and criteria prepared by CYA for use by juvenile courts in making CYA referrals. In particular, the court listed several inappropriate cases for commitment, including (1) youths who are dependent or primarily placement problems; (2) unsophisticated, mildly delinquent youths; and (3) mentally retarded or mentally disturbed youths. (*In re Aline D., supra,* 14 Cal.3d at pp. 564-565.) The court also relied upon statistics from the CYA facility in which Aline would be placed which indicated that she would be placed in the company of girls who had committed serious offenses, including 16 homicides, 31 robberies and 38 assaults. (14 Cal.3d at p. 565.) Other statistics from CYA's 1973 annual report showed that 85 percent of all youths committed to CYA had three or more incidents of delinquency and 35 percent had eight or more such incidents. (*Ibid.*)

The court stated that a CYA commitment may not be made for the sole reason that suitable alternatives do not exist. (*In re Aline D., supra,* 14 Cal.3d at p. 562.)[1] It held that the juvenile court abused its discretion in ordering CYA commitment. The record indicated that Aline D. was not an

---

[1] This broad pronouncement of the court is misleading. In most cases when a juvenile court orders CYA commitment, it does so presumably because other less restrictive options have been unsuccessful in achieving rehabilitation and treatment. In this sense, suitable alternatives to CYA do not exist. In the best of worlds it would be desirable to have many less restrictive, effective alternatives to CYA. In reality, the system can support only so many placement options. One must distinguish between the absence of alternatives because the county or state has failed to provide appropriate options to CYA and the absence of alternatives because all appropriate options have been explored and none has proven effective in a particular case to rehabilitate the youth.

appropriate candidate for such a commitment despite the finding by the referee that she would probably benefit from CYA.

"In sum, the record before the juvenile court discloses that CYA may not be a suitable placement facility for Aline, and that the referee himself, acting for the juvenile court, entertained very substantial doubt in the matter. The record does not disclose that the court was, in the language of the statute, 'fully satisfied that the . . . condition and qualifications of the ward are such as to render it probable that he will be benefitted' by the discipline or treatment available at CYA." (14 Cal.3d at p. 565.)

In *In re Carrie W., supra,* 89 Cal.App.3d 642, this court reversed the CYA commitment of a 16-year-old unwed mother. Carrie had been a ward of the court since the age of 14. She had a history of petty thefts and malicious mischief. During her commitment to a home for unwed mothers in Los Angeles she made $338.53 in unauthorized long distance telephone calls to Bakersfield to her family and boyfriend. The Welfare and Institutions Code section 602 petition alleged a violation of Penal Code section 502.7, subdivision (a)(1), obtaining telephone services by fraud. Her probation officer recommended CYA based upon his conclusion that she was defiant and obstinate and that other placements had not worked because she had "'. . . no desire to benefit by the opportunities presented her. . . .'" (89 Cal.App.3d at p. 645.)

Notwithstanding the juvenile court's finding that Carrie would benefit from a CYA commitment, this court held in those circumstances that Carrie's commitment to CYA was an abuse of discretion. A two-pronged analysis was used in assessing the exercise of discretion by the juvenile court. First, we considered the goals of the juvenile justice system—rehabilitation and treatment, not punishment. The statutory scheme contemplated commitment to CYA as a last resort in only the most serious cases. (*In re Carrie W., supra,* 89 Cal.App.3d at pp. 646-647.) Second, we considered Carrie's profile in light of CYA guidelines and criteria, as set forth in *In re Aline D., supra.* She was unsophisticated, mildly delinquent and primarily a placement problem. She had never engaged in any aggressive, destructive or assaultive conduct nor in any criminal activities more serious than petty theft, truancy and disobedience of a superior's orders. We noted the offense upon which the petition was sustained likewise was not a serious criminal offense.

"We do not believe that the criteria for commitment to CYA includes the existence of a defiant, recalcitrant attitude displayed by a minor in this context when the commitment is predicated upon the probation department's frustration or sense of hopelessness in dealing with the minor after

various other alternatives have been tried and have not been successful. It is quite apparent that the progressively more restrictive and punitive series of disposition orders contemplated by *In re Aline D.* is not intended to authorize the commitment to CYA merely because various local alternatives have been tried unless the underlying conduct and juvenile record upon which the commitment is based can be classified as being one of the more serious type cases (*In re Aline D., supra,* 14 Cal.3d at p. 564) for which commitment to the CYA 'as *the final treatment resource* available' (at p. 564) is justified. That is clearly not the situation here." (*In re Carrie W., supra,* 89 Cal.App.3d at p. 648.)

We concluded that the appropriate standards for commitment had not been applied and held that there was insufficient evidence to support the pro forma finding that Carrie would benefit from CYA commitment.

*In re Todd W., supra,* 96 Cal.App.3d 408, involved circumstances similar to those in the present case. By the age of 13, Todd had been placed unsuccessfully in several foster homes and group homes. He had a history of running away, which resulted in informal supervision, and two auto thefts, one of which was the basis of the petition which resulted in his commitment to CYA. Probation officers characterized Todd as antisocial and impulsive, with " '. . . little if any guilt, . . .' " and expressed their concern that he could " '. . . indirectly or directly hurt somebody. . . .' " (96 Cal.App.3d at pp. 412-413.) Two options were considered for Todd: CYA and the Los Prietos Boys' Ranch. Los Prietos was willing to accept Todd and felt that he would benefit from the program. An employee from CYA testified that Todd would probably not be accepted by CYA given his age, his lack of sophistication and that he had not engaged in serious criminal behavior. Todd's probation officer recommended CYA, while the caseworker from the group foster home in which he had previously been placed recommended Los Prietos.

The juvenile court expressed its concern for the safety of the community and for Todd's need for "discipline, remedial education, and treatment of emotional problems." (*In re Todd W., supra,* 96 Cal.App.3d at p. 416.) The court expressed as well its frustration at the lack of alternatives available to it. (*Ibid.*) Los Prietos was rejected because it was not a locked, secure facility, and Todd was committed to CYA. (*Ibid.*)

Relying upon *Aline D.* and *Carrie W.* this court concluded that appropriate CYA standards had not been applied. (*In re Todd W., supra,* 96 Cal.App.3d at p. 419.) "While Todd's adjudicated criminal conduct was somewhat more serious than that in *Carrie W.,* and while we in no way condone it, the fact remains that auto theft is not 'one of the more serious

type cases' such that the trial court here was justified in bypassing a less restrictive and less punitive placement, such as Los Prietos Ranch." (96 Cal.App.3d at p. 419.)

We distinguish each of these cases in certain important particulars. Unlike the present case, the juvenile court referee in *Aline D.* referred her for CYA commitment for the sole reason that there were no available alternatives. Similarly, the court in *Todd W.* rejected an available, appropriate and yet unexplored alternative. On the other hand, the court here assessed Lorenza's record and concluded that all appropriate alternatives had been exhausted without success. What distinguishes *Carrie W.* from the present case is the seriousness of the criminal conduct in which Lorenza has been engaged.

What is troubling about the previous cases when we compare them to the present facts is that even though they address concerns regarding the availability of options, they actually focus on the profile of the juvenile offender. They assess the appropriateness of CYA in terms of statistics, guidelines and criteria from 1974, which may or may not be applicable in 1989. Furthermore, a consistent theme in the previous cases is the concept that only the most serious offenders should be sent to CYA and only if appropriate, less restrictive alternatives have proven ineffective. The juvenile court expressed its opinion that Lorenza was not a criminal. Indeed, her offenses were no more serious than those of the minor in *In re Todd W.* If the court must follow the principles announced in these cases, Lorenza was not an appropriate candidate and her commitment to CYA must be reversed.

However, *Aline D., Carrie W.* and *Todd W.* predate the amendment of former Welfare and Institutions Code section 502 (now § 202) regarding the purposes of the Juvenile Court Law. In 1984, the Legislature amended the statement of purpose found in section 202 of the Welfare and Institutions Code. It now recognizes punishment as a rehabilitative tool and emphasizes the protection and safety of the public. (Stats. 1984, ch. 756, §§ 1, 2.)[2] The

---

[2] Welfare and Institutions Code section 202 provides in part: "(a) The purpose of this chapter is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public. When the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents. This chapter shall be liberally construed to carry out these purposes.

"(b) Minors under the jurisdiction of the juvenile court who are in need of protective services shall receive care, treatment and guidance consistent with their best interest and the best interest of the public. Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment and guidance which is consistent with their best interest,

significance of this change in emphasis is that when we assess the record in light of the purposes of the Juvenile Court Law (*In re Todd W., supra,* 96 Cal.App.3d at pp. 416-417), we evaluate the exercise of discretion with punishment and public safety and protection in mind. Such was not the case before 1984.

Although the juvenile court did not identify punishment as a motivation in committing Lorenza to CYA, the use of punishment as a rehabilitative tool is ultimately the factor that distinguishes this case from those upon which she relies.

Welfare and Institutions Code section 202, subdivision (e), sets forth the following progressive list of "sanctions" deemed appropriate "punishment" for juvenile offenders: (1) *Payment of a fine by the minor.* [¶] (2) Rendering of compulsory service without compensation performed for the benefit of the community by the minor. [¶] (3) Limitations on the minor's liberty imposed as a condition of probation or parole. [¶] (4) Commitment of the minor to a local detention or treatment facility, such as a juvenile hall, camp, or ranch. [¶] (5) Commitment of the minor to the Department of the Youth Authority.

It appears from the record that all of the less restrictive sanctions had been used in an effort to rehabilitate Lorenza. The Legislature contemplated CYA commitment as the last sanction in the scheme of "rehabilitative punishment." The court ordered CYA commitment because all less restrictive sanctions had proven ineffective. Whether or not Lorenza is a serious juvenile offender or a "criminal," her commitment is consistent with the current purposes of the Juvenile Court Law.

The judgment is affirmed.

Martin, Acting P. J., and Baxter, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 26, 1989.

---

which holds them accountable for their behavior, and which is appropriate for their circumstances. *Such guidance may include punishment that is consistent with the rehabilitative objectives of this chapter.* Juvenile courts and other public agencies charged with enforcing, interpreting and administering the Juvenile Court Law shall consider the safety and protection of the public and the best interest of the minor in all deliberations pursuant to this chapter." (Italics added.)