Filed 9/11/14  In re Stephen S. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re STEPHEN S., a Person Coming Under the Juvenile Court Law. | C075042 |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>STEPHEN S.,<br><br>      Defendant and Appellant. | (Super. Ct. No. JV128534) |

Minor Stephen S. contends the juvenile court abused its discretion by committing him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ).  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Stephen S., born in October 1994, was declared a dependent of the juvenile court system (Welf. & Inst. Code, § 300)[1] in July 2001, and was thereafter placed in foster homes and group homes.

_____

[1]     Undesignated section references are to the Welfare and Institutions Code.

1

In October 2008, the Sacramento County District Attorney filed a section 602 petition in the juvenile court, alleging Stephen had committed three misdemeanor batteries (Pen. Code, § 242) against staff members at his group home. Stephen's dependency status was continued and the court placed him on informal supervision. After Stephen completed the terms and conditions of his supervision, the court dismissed the petition. (§ 654.2.)

In July 2009, the district attorney filed a new section 602 petition, alleging Stephen had committed the offenses of making criminal threats (Pen. Code, § 422), misdemeanor battery (Pen. Code, § 242), and misdemeanor vandalism (Pen. Code, § 594, subd. (b)(2)(A)); the alleged victim of the battery was a staff member at Stephen's group home. Stephen's dependency status was continued and he was placed on informal supervision with specified terms and conditions for six months. (§ 654.2.)

In February 2010, the district attorney filed a new section 602 petition, alleging another battery against a staff member at Stephen's group home. His dependency status was continued. He admitted the misdemeanor battery allegations in the present petition and the July 2009 petition. He was placed on six months of court probation (§ 725, subd. (a)) and committed to serve eight days in juvenile hall, but given credit for eight days time served.

In December 2010, Stephen's probation was terminated and both petitions were dismissed.

In April 2011, the district attorney filed a new section 602 petition, alleging yet another misdemeanor battery against a staff member at Stephen's group home. After Stephen admitted the allegation, his dependency status was continued, and he was placed once again on six months of court probation and ordered to spend nine days in juvenile hall with credit for time served. (§ 725, subd. (a).)

In November 2011, a violation of probation petition was filed, alleging that Stephen failed to complete community service and aggression counseling. The juvenile

court offered a conditional dismissal if Stephen complied with these conditions and set the matter for further hearing in April 2012.

In February 2012, the district attorney filed a new section 602 petition, alleging that Stephen committed two felony assaults on staff members at his group home, one with a deadly weapon and the other by means of force likely to produce great bodily injury (Pen. Code, § 245, subds. (a)(1) & (4)), and misdemeanor vandalism (Pen. Code, § 594, subd. (b)(2)(A)). The juvenile court set a hearing on the probation violation and the new petition. The court also ordered a competency evaluation, which was performed by psychologist Dr. Frank Weber.

Dr. Weber reported that Stephen's current group home, where he was accused of committing his first felony offenses, was more restrictive than the one in which he had previously been placed. At the former group home, he had been written up for over 50 incidents of assaultive behavior directed at staff, and the police had been called there on a number of these incidents; he also had poor hygiene and urinated on other people's property. In the present case, he was alleged to have broken a window because he was upset with a staff member at the current group home, then chased the staff member with a piece of broken glass and attempted to hit the staff member with a four-foot long fence board; another staff member who tried to intervene sustained a small cut on the top of his head.

Stephen admitted to temper problems, for which he had received "a lot" of counseling. He denied any other mental disorder. He was previously diagnosed with posttraumatic stress disorder (PTSD), mood disorder not otherwise specified (NOS), and attention deficit hyperactivity disorder (ADHD). He was in eleventh grade and in special education. His grades had fallen since ninth grade. His intellectual functioning tested as low average to average.

In Dr. Weber's opinion, Stephen suffered from conduct disorder and mood disorder NOS, but not from the other disorders previously diagnosed. He was not

3

mentally retarded, but he was developmentally immature and could not control his behavior.

After the juvenile court found Stephen competent to stand trial, Stephen admitted the charge of assault by means of force likely to produce great bodily injury and the remaining allegations of the petition were dismissed. The court revoked and reinstated his probation, adjudged him a ward of the court, and terminated his dependency status. The court committed him to juvenile hall for 135 days with credit for time served, and to further time in juvenile hall pending suitable Level "A" placement.

In June and July 2012, two more probation violation petitions were filed. The first (dismissed after the second was filed) alleged Stephen committed misdemeanor battery against a probation assistant at juvenile hall. The second alleged second degree burglary (Pen. Code, § 459) in October 2011.

In October 2012, the juvenile court held a contested jurisdictional hearing, sustained the battery allegation, but dismissed the burglary allegation, and revoked Stephen's probation. The court rejected the district attorney's proposal for DJJ commitment, finding it "inappropriate." The court found the probation officer's alternative proposal for Level "A" placement was no longer available because Stephen was 18.

After vacating all previous dispositional orders, the court revoked and reinstated probation, then committed Stephen to 365 days in juvenile hall with credit for 261 days served. On completion of that commitment, Stephen was ordered committed to his own care and custody under the supervision of the probation officer.

On March 21, 2013, although Stephen was, by then, 18 years old, 6'1" and 306 pounds, the district attorney filed a new petition under sections 602 and 777, alleging Stephen stayed away from home for more than 48 hours without his probation officer's permission, failed to keep the probation officer informed of his mailing address and telephone number at all times, and failed to contact the probation officer. The petition

4

stated Stephen was released to the custody of an aunt living in Hercules (Contra Costa County), but she decided as of March 7, 2013, she no longer wanted him to reside with her, and had no contact with him since March 15, 2013.

On May 21, 2013, the juvenile court held a contested jurisdictional hearing on the probation violation. The court sustained count I of the petition, alleging Stephen stayed away from home without his probation officer's permission, but dismissed the other two counts for insufficient evidence. The court found the underlying offense, assault with a force likely to produce great bodily injury, was a felony. The court continued the contested disposition hearing.

The district attorney filed a pleading recommending a commitment to DJJ. The pleading asserted: "Numerous attempts have made to correct [Stephen's] delinquent behavior. He has been placed on Informal Supervision more than once and has previously been placed in Level '12' and Level '14' residential treatment facility group homes. [Stephen] is now 18 years old. He has an extensive record of assaulting staff and absconding. All local level placements have been exhausted and no Level 'B' Placement is willing to accept him. Every rehabilitative option has been tried, and all have failed with [Stephen]. A commitment to the [DJJ] . . . is necessary, in order to provide the necessary structure to promote the rehabilitative goals of the Juvenile Court and to protect the public from [Stephen's] delinquent and violent propensities."[2]

---

[2] The pleading recited Stephen's delinquent history from 2008 to the present, taking more than 10 pages to do so, and attached multiple exhibits which laid out the evidence in much greater detail. The pleading also asserted that Level "B" placement was evaluated during Stephen's most recent juvenile hall commitment, but all four Level "B" placements contacted rejected Stephen due to past poor performance in group home settings.

5

On June 18, 2013, the juvenile court referred the matter back to probation to contact one more potential Level "B" placement, and to determine whether Stephen had graduated from high school, which would make him ineligible for such placement.

On July 11, 2013, the juvenile court stated the probation department advised the court the remaining Level "B" placement declined to accept Stephen and he had acquired a high school diploma. The court continued the contested disposition hearing to August 27, 2013, because Stephen's counsel had hired a retired probation officer to investigate whether any option, other than DJJ and not currently known to probation, existed.

On August 27, 2013, the juvenile court held the contested disposition hearing. Neither party presented witnesses.

Stephen's counsel, although his sentencing consultant had found no option for which Stephen would qualify, claimed there were still two programs under investigation. Counsel requested a continuance to explore them. The court asked whether either program was a secure facility. Counsel said: "No, your Honor." Finding that the programs' lack of security eliminated them as viable alternatives, the court denied counsel's request for a continuance.

Stephen's counsel argued against a DJJ commitment on the following grounds:

(1) Nothing significant had changed since the October 2012 disposition hearing, when the juvenile court rejected DJJ. Stephen had fully served his one-year juvenile hall commitment. The current probation violation was merely a "technical violation . . . of conditions of Probation," not "a new charge" or "assaultive conduct."

(2) Conditions at DJJ were violent, and the inmate population consisted of "the worst youthful offenders." Stephen was not one of those. Although he had "a long history of assaultive conduct," he was not "someone who is out on the streets committing violent offenses like some of the kids in the hall and CYA [*sic*] now."

6

(3)  Stephen would not benefit from DJJ; it would be pure punishment and "warehousing."  He had almost no opportunity to live on his own, and a DJJ commitment would not help him to do that.

(4)  Therefore, counsel requested juvenile hall time, followed by release on Stephen's 19th birthday and continuing wardship.

The juvenile court ruled:

"Stephen has a very severe history.  I hesitate to use the word 'criminal history' because he's so young, and he did some of these things when he was even younger, but they are clearly offensive conduct which would be crimes if he were an adult.

"The disposition is not for failing to keep Probation advised where he's living . . . .

"The disposition is taking place because [of] a hundred percent of his entire personal history and his offense conduct and his mental health conduct and his social adjustment and all of those things taken together . . . .  [The disposition for] [h]is first offense . . . was on October 29th of 2008, a misdemeanor battery violation of section 242 of the Penal Code.

"He was placed on informal probation pursuant to section 654.2, in part, I'm sure . . . , because he was a . . . 300 dependent.  The battery took place in the group home. July of '09, another 242 battery, again, in the group home, again, placed on 654.2.  May of 2010, three counts of 242 battery . . . in the group home.

"June of 2012, 245(a)(4) which as I recall also took place in an institution, and . . . the disposition was wardship for level A placement.  But before he actually got to level A placement in July of 2012, there was another 242 battery at the juvenile detention facility for which the People filed a violation of probation petition and Stephen received 135 days in juvenile hall.

"Then in October 2012, another violation of probation, he was given 365 days of juvenile hall, and he actually served 261 days before being released.

"He was tried in foster care as a 300 dependent.  He was in a level 12 facility at Paradise Oaks as a dependent.  He had over 50 incident reports for misconduct while at Paradise Oaks.  He was also in a level 14 facility at Milhous as a dependent, and he failed at that facility.

"Now, when he was released in 2012 after the most recent violation of probation, . . . the hope was that everything that you've said today . . . would have worked . . . a year ago.  And while . . . his violation of probation is on a spectrum from most benign to most aggregated [*sic*; aggravated], it does demonstrate an unwillingness or inability to conform to the requirements of Probation.  [¶]  . . .  [¶]

"[W]e have looked repeatedly for alternatives to DJJ over the last several months, and I referred him back to Probation to have another look at a possible level B placement . . . , but no one accepted him which makes him, in effect, ineligible to be placed at level B.

"We also looked at the possibility of whether we could put him in a level A facility, but because he's graduated from high school, he can't go to a level A or level B facility as it turns out because of a combination of his age and high school graduation.  So that wipes out any legal possibility of placement at those centers.

"We have talked about fairly innovative placements with organizations which are not currently used as level A placements in the State of California.  You've . . . looked at a number of facilities, none of which have been found to be appropriate or willing to accept him [except] . . . the two you mentioned at the beginning of your comments which you have not got a definitive answer on.

"I do find, however, that it's necessary to provide a level of security for Stephen because he has a well-demonstrated, five-year history of assaultive conduct, and it's logically addressed to the people who work in the facilities in which he's been placed.  So I find that a level of security would be necessary for Stephen no matter what I would

8

have come up with at disposition.  He has served . . . approximately five months in juvenile hall.

"Since the . . . most recent [violation of probation] started, . . . one possibility can be to simply say, all right, I'm going to commit you to juvenile hall for however days you've served . . . .

"Another possibility would be to confine him and then . . . release him effective immediately.  Another alternative would be to give him more time in juvenile hall so that he wouldn't be released immediately, and he would simply stay in juvenile hall for a period of time.  But he's already . . . had an order for 365 days . . . , and he served almost nine months of that time and having been released . . . , he very shortly thereafter violated probation.  So I don't have an awful lot of hope that putting him back in the juvenile detention facility is likely to change his conduct.

"I also don't have any hope if I put a disposition that would keep him past his 19th birthday so that he would have to be transferred to the county jail that his experience in the county jail . . . is going to provide either rehabilitation for him or any education or training that would be useful to him as he goes on in his life.

"If I were to send him to DJJ, there are services . . . available to him.  I can't guarantee that he will use them and get the benefit.  [¶]  . . .  [¶]

"I have been down to Stockton to DJJ personally.  I have toured that facility, and I have discussed with staff over a period of a couple of hours in the past couple of years what's down there, and I do know that at least in the Stockton DJJ facility they have varying levels of custody in terms of housing . . . .  I know that they have education programs up through the high school level.  I know that they have job training programs . . . .

"I do know there [are] some psychological services and psychiatric services . . . .  There's also counseling . . . .  While the juvenile detention facility does its very best to

9

provide high school level education and medical and psychological services, the level of those services that we're prepared and able to provide here [is] very limited.

"So I do find that [DJJ] is the most appropriate at this point in Stephen's life because it does provide services that he does need, and no other alternative is available to me. It does provide for those services at a level of security that I believe he has demonstrated that he needs. [¶] . . . [¶]

"I find there are no additional preplacement services that could be offered to the minor or his family which could prevent the need for the removal of the minor. The Court finds that reasonable efforts have been made to prevent or eliminate the need for removal of the minor from parental custody and to make it possible for the minor to return to parental custody. At this point, he's over 18, so he's not going to return to parental custody in any event.

"Findings are based on the fact that the minor was supervised for over 12 months on probation supervision and failed. Minor [received] counseling services from Paradise Oaks, Milhous, and Department of Health and Human Services. . . . Continuation in the home of his parent or legal guardian would be contrary to the minor's welfare.

" . . . Parent or guardian past has demonstrated to be incapable of providing and has failed or neglected to provide the proper maintenance and training for the minor. Minor has been tried on probation in parental or guardian custody and has failed to reform.

"Placement and care are the responsibility of the Sacramento County Probation Department. . . ." [¶] . . . [¶]

"I find the mental and physical conditions of the minor . . . are such [as] to render it probable that he will be benefited by the reformatory and educational discipline and other treatment provided by [DJJ], and less restrictive alternatives are ineffective and/or inappropriate."

The juvenile court committed Stephen to four years in DJJ.

10

DISCUSSION

Stephen contends the juvenile court's order was an abuse of discretion because substantial evidence does not support the court's finding of his "probable benefit" from a DJJ commitment and that less restrictive alternatives would be inappropriate or ineffective. We disagree.

When making a sentencing decision under the juvenile court law, the court "shall consider the safety and protection of the public, the importance of redressing injuries to victims, and the best interests of the minor." (§ 202, subd. (d).) In determining disposition, "the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.)

"No ward of the juvenile court shall be committed to [DJJ] unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by [DJJ]." (§ 734.)

"The appellate court reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision. [Citations.] Nonetheless, there must be evidence in the record demonstrating both a probable benefit to the minor by a [DJJ] commitment and the inappropriateness or ineffectiveness of less restrictive alternatives. [Citations.] A [DJJ] commitment may be considered, however, without previous resort to less restrictive placements. [Citations.]" (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.) "Nor does the court necessarily abuse its discretion by ordering the most restrictive placement before other options have been tried. [Citations.]" (*In re Eddie M.* (2003) 31 Cal.4th 480, 507.)

In determining whether substantial evidence supports a DJJ commitment, a reviewing court must examine the evidence at the disposition hearing in light of the purposes of the juvenile court law. (*In re Lorenza M.* (1989) 212 Cal.App.3d 49, 53.)

11

These include (1) "the protection and safety of the public" (§ 202, subd. (a)), and (2) "care, treatment, and guidance that is consistent with [the minor's] best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances[,] [which] may include punishment that is consistent with the rehabilitative objectives of [the juvenile court law]." (§ 202, subd. (b)).

Stephen was already 18 years old by the time the juvenile court ordered him committed to DJJ. Stephen's underlying offense was a violent felony, the latest in a long and escalating series of assaultive acts over a five-year period. During that time, the court had tried many less restrictive alternatives to deal with Stephen; all had failed. Thus, evidence on all the factors set out in section 725.5 supported the court's order. Given Stephen's incorrigible pattern of assaultive conduct and his failure to learn from any previous discipline, so did the factors set out in section 202.

Stephen asserts there is no substantial evidence he will probably benefit from a DJJ commitment because probation and the district attorney presented no evidence about DJJ's programs and services, and the juvenile court's statements about its personal knowledge of such programs and services at the Stockton DJJ facility were too vague and general to count as substantial evidence. In Stephen's view, " '[s]ubstantial evidence' would require specific, up-to-date reports on programs and treatment presently available at the DJ[J], and how such programs could address [Stephen's] needs." But Stephen does not cite any authority so holding. *In re Martin L.* (1986) 187 Cal.App.3d 534, on which Stephen relies, merely notes certain specific evidence presented in that case was sufficient to justify the juvenile court's findings. (*Id.* at p. 544.) The opinion does not hold only such evidence counts as substantial, or a juvenile court judge may not base a finding of probable benefit on his personal knowledge of DJJ's programs. Thus, Stephen's premise fails for want of developed argument and authority. (*Quail Lakes Owners Assn. v. Kozina* (2012) 204 Cal.App.4th 1132, 1137.)

12

Furthermore, the juvenile court found probable benefit to Stephen, not only from the programs and services offered at DJJ, but also from its secure setting. In light of Stephen's miserable record in other environments, the court found he needed a secure setting to benefit from any programs offered. That was an appropriate basis, supported by substantial evidence, to find that a DJJ commitment would probably benefit Stephen. (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 485-486.)

Stephen asserts his history suggests a DJJ commitment could actually harm him. According to Stephen, because he is immature, not criminally sophisticated, lacks a history of drug or alcohol abuse, and has "mental health needs," he could suffer from being forced to commingle with the more hardened and sophisticated types of juvenile criminals housed in DJJ. Instead, he should be housed in "a therapeutic, rather than a punitive, environment."[3] But no less punitive placement was available: the juvenile court, probation, and Stephen's counsel searched diligently for such a placement for months before the disposition hearing and came up empty. In any event, as the court found, a "therapeutic . . . environment," one lacking DJJ's level of security, would not serve Stephen's needs because he did not benefit from potentially helpful programs, such as those dealing with his bad temper, at his prior nonsecure placements. In addition, a nonsecure "therapeutic" placement would not serve the juvenile law's purposes of punishment and protecting the public from Stephen's habitual and worsening criminality. (§ 202, subds. (a), (b).) Stephen's speculative assertion DJJ might make him a still worse criminal cannot outweigh the juvenile court's findings on these points.

Stephen asserts substantial evidence does not support the juvenile court's findings that less restrictive alternatives would be inappropriate or ineffective because the court

---

[3] As to his "mental health needs," Stephen notes he "previously received a diagnosis of [PTSD] and Mood Disorder." But he does not mention that the psychological evaluation that includes this statement rejected the PTSD diagnosis.

13

actually found only such alternatives were unavailable, and there is no evidence that "boot camps," "wilderness programs," or "options available to [Stephen] as a former foster youth, or as an adult" were investigated or had appropriate levels of security. Stephen's unsupported speculation that other alternatives must have existed, even though everyone involved in the case inexplicably overlooked them, is not cognizable.[4] But, more fundamentally, his premise is wrong: the court expressly found any alternative less secure than DJJ, even if one could be discovered at the last minute that could and would accept Stephen (unlike all those known to the court, probation, and Stephen's counsel after long investigation), would be inappropriate and ineffective for all the reasons we have already discussed. Substantial evidence supports that finding.

In short, Stephen has failed to show the juvenile court's order committing him to DJJ was an abuse of discretion.

### DISPOSITION

The order of commitment to DJJ is affirmed.


                                                 NICHOLSON     , Acting P. J.

We concur:


      BUTZ            , J.


      MURRAY        , J.

---

[4]     Stephen asserts the juvenile court had, but did not explore, the option of "[a] combination of secure confinement at the juvenile hall, to hold [Stephen] accountable for his actions, followed by placement in a program geared toward assisting young adults with housing, psychological services and job training." This point fails for two reasons: (1) Stephen does not identify this "program," and (2) he does not explain how the juvenile court could have retained jurisdiction to place him there after he had completed his juvenile hall commitment, since he was already over 18.