Filed 6/24/15  In re Andres R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re ANDRES R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | F070087 |
| Plaintiff and Respondent, | (Super. Ct. No. 14CEJ600263-1) |
| v. | |
| ANDRES R., | **OPINION** |
| Defendant and Appellant. | |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Gregory T. Fain, Judge.

Robert F. Kane, under appointment by the Court of Appeal, and Rick Horowitz for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Poochigian, Acting P.J., Franson, J. and Peña, J.

Andres R. appeals from his commitment to the California Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ),[1] after admitting allegations that he committed assault with a deadly weapon (a baseball bat) for benefit of, or in association with a criminal street gang.  We affirm.

## FACTS AND PROCEDURAL HISTORY

On April 10, 2014, the Fresno County District Attorney filed a wardship petition under section 602, alleging that Andres committed murder while armed with a firearm. (Pen. Code, §§ 187, subd. (a), 12022, subd. (a)(1); count 1.)[2]  Andres denied the allegations.  On June 18, as part of a plea agreement, a first amended wardship petition was filed.  It added count 2, which alleged Andres committed assault with a deadly weapon (a baseball bat) for the benefit of, at the direction of, or in association with a criminal street gang.  (Pen. Code, §§ 186.22, subd. (b)(1), 245, subd. (a)(1); count 2.) Andres admitted count 2, in return for which count 1 was dismissed, and the matter was set for disposition.

In the course of Andres's admission, the following occurred:

> "THE COURT:  Counsel, how would you wish to handle the factual basis?  Would you like to set it forth … at this time, Mr. Brickey [(prosecutor)]?

> "MR. BRICKEY:  Sure.  I can make an attempt, and I would invite counsel if I leave anything out to go ahead and add in.

> "THE COURT:  So you need to listen, and then I'm going to ask you if you agree to this.  Okay.  [¶] … [¶]

---

[1]     In the record, the minor's first name is variously spelled "Andres" or "Andreas." We use the first spelling, as it was used by Andres and his relatives in the letters they wrote to the court.

DJJ is sometimes referred to as the Division of Juvenile Facilities.  (See, e.g., Welf. & Inst. Code, § 1710, subd. (a); further statutory references are to the Welfare and Institutions Code unless otherwise stated.)

[2]     All references to dates in the facts and procedural history are to 2014.

"MR. BRICKEY: On or about February 26th, 2014, this minor, along with other coparticipants, went to the home in which the victim … Kevin Roy Bonton and others, including a Norteño gang member or Norteño dropout were staying.

"The minor and other coparticipants requested that the Norteño and Mr. Bonton exit the house. When they did not exit, the minor and his coparticipants, some of which were armed with bats, one of which was armed with a handgun, waited for Kevin Bonton and the Norteño to exit the house. When Mr. Bonton and the Norteño exited the house on bicycles, they fled. They were chased by the minor and other coparticipants. One other coparticipant, Jacob Abston, who was armed with a handgun, shot and killed Kevin Roy Bonton as he was fleeing the scene.

"THE COURT: That was in Fresno.

"MS. SANCHEZ [*sic*]: That was in Fresno. Mr. Abston the People believe and allege that he is an active participant of the Fresno Bulldogs along with coparticipant [P.M.].

"THE COURT: Okay.… [¶] Do you so stipulate, Mr. Horowitz [(defense counsel)]?

"MR. HOROWITZ: Your Honor, the only thing I do want to say about that is the facts relating to the shooting are not part of count two. So in terms of a factual basis for count two, those particular facts are irrelevant to count two. They may be relevant in terms of disposition overall, but they are not relative to count two.

"THE COURT: All right. Still yet they are part of —

"MR. HOROWITZ: And I will otherwise stipulate.

"THE COURT: Okay.

"MR. BRICKEY: And that occurred in Fresno County.

"THE COURT: Fresno County. [¶] Did you hear the statement of facts as set forth on the record by counsel at this time, Andres?

"THE MINOR: Yes, sir.

"THE COURT: Is that what happened?

"THE MINOR: Yes, sir."

3.

In preparation for the disposition hearing, the probation officer reported that Andres, who recently turned 17 years old, was enrolled in 10th grade in an independent studies/IEP program, and was receiving C's and D's. Andres said he wished things had not happened as they did; he did not know what was going to take place or that anyone had a gun or a bat. The probation officer reported Andres did not have a prior record, but had engaged in some misbehavior (mostly in the form of not following rules and making inappropriate comments) while detained at the Juvenile Justice Campus (JJC).

The probation officer recommended Andres be committed to DJJ. She recognized this was Andres's first adjudicated offense, but found the protection of the community was paramount; Andres had involved himself in gang activity; and less restrictive programs would not provide an adequate level of rehabilitation or accountability for him under all the circumstances.[3] She recommended the maximum period of confinement be set at nine years (four years for the offense plus five years for the gang enhancement) in order to hold Andres accountable, afford him an opportunity to rehabilitate, and provide protection to the community. The probation officer related that if committed to DJJ, Andres would have a baseline discharge date of two years, and that after an assessment of his needs that would include psychological testing, a treatment program would be developed. Andres would participate in an academic program, and would also be referred to other programs including Aggression Interruption Training, Gang Awareness, Victim Awareness, and Counter Point.

---

[3]    At the time of Andres's admission, the prosecutor made clear that the Penal Code section 186.22 enhancement was not based on Andres being an active participant in a criminal street gang, but on the crime having been committed in association with, for the benefit of, or at the direction of a criminal street gang. When interviewed by police after the shooting, Andres denied being a Bulldog gang member, but admitted his friends were. He also admitted he was aware there was going to be a fight, so he went to "back up" his friends.

4.

In a letter to the court, Andres admitted he should not have gone to the house, and stated he understood the wrong that was done that night. Andres said he learned from that night that he needed to be careful who he called his friends and with whom he associated, because he could easily be accused and get in trouble for someone else's wrongdoing and mistakes. Andres related that his goals were to graduate from high school, get a degree in music engineering, and own his own studio, and that he had a job with his uncle in an aluminum business. A number of Andres's relatives wrote letters on his behalf.

A disposition hearing was held July 25. Multiple family members and friends were present. At the outset, the court stated it had read and considered the probation officer's report, the letter from Andres and its attachments showing his goals, and numerous letters in support of Andres.

Defense counsel represented, based on his discussions with Andres, that Andres knew there was going to be a fight on the night Bonton was killed, but did not know anyone was going to bring a weapon or be killed. Counsel related that Andres disavowed membership in the Bulldogs gang, but sometimes associated with friends who were in the gang. Counsel informed the court that Andres's admission was, to a certain extent, in the nature of a "no contest" admission; Andres had been told by the prosecution that if he did not plead to second degree murder with a deadly weapon enhancement, the People would request a fitness hearing. Andres wanted to force the People to prove the allegations, but, when the new offer was made, he discussed his options with counsel and reluctantly concluded it was in his best interests to accept it. Counsel further noted there was no evidence Andres personally was armed.

Defense counsel pointed out that Andres had no prior record of any kind of criminal involvement. Counsel also related that although Andres originally was confused and upset and feeling unjustly accused, he immediately began working with counsel and others to set goals. He also started reading in order to improve his reading and writing

skills. Counsel represented that Andres had raised the level at which he was working in science and math. Andres also started going to some kind of a church group and had stopped cussing, and was being trusted enough to be given job assignments in a high security pod at JJC. JJC staff had told counsel that Andres was generally a nice young man who tried to do what he was supposed to and who stayed out of trouble.

Counsel noted that DJJ's own Web site said local commitments were preferred to make it easier for family to participate in rehabilitation. Counsel drew the court's attention to the number of family members who were present and/or had written letters in support of Andres. Counsel also argued Andres had demonstrated his ability to respond to local rehabilitative efforts. Counsel asserted the seriousness of the offense itself was not dispositive; rather, the court had to look at Andres's level of involvement. Counsel concluded that when all factors were considered, a local commitment was appropriate.

The prosecutor responded that Andres was not before the court because of what he did with his family, but because of what he was doing "out on the streets." He pointed out that the People's theory of the assault was not that Andres personally was armed, but that he aided and abetted others who obviously were armed. The prosecutor noted Bonton was dead and would not have a chance to achieve the kind of goals Andres had set for himself, and he argued Abston would not have been brazen enough to do what he did without the support of Andres and the others who were present. The prosecutor asserted that if someone was associating with gang members who said they were going to get in a fight, common sense suggested it was likely someone would get badly hurt. He argued there had to be consequences for actions.

The probation officer acknowledged this was Andres's first offense and he had a lot of family support. She stated, however, that there were no local commitments that would offer him the educational services available at DJJ.[4] She recognized Andres could

---

**4** Andres was determined to be an individual with exceptional needs.

attend school at JJC, but explained the services were not as extensive, or the teacher-to-student ratio as low, as at DJJ. She also related DJJ could provide gang awareness education classes and programs, as well as victim awareness education, that would not be available at the local level. The probation officer viewed Andres's good response at the local level as proving he would excel at DJJ, where he would receive much more than could be offered locally.

Andres personally addressed the court. He related how much help he was getting at JJC, both in terms of setting goals and improving his educational skills, and in terms of how the church services helped him get through a lot of things. Andres expressed confidence he could come back from the mistakes he made, and he said he had learned there were people with whom he should not associate.

The court acknowledged Andres's strong family support. It also found Andres to be a person who had a "good heart" and who could have a very successful life. It noted Andres had had to overcome family hardship and issues with his educational situation. The court explained:

> "But you should understand, and your family should understand, that I have to take all into account. Okay. I want to do what's in your best interests. But I also have to take into account the seriousness of the offense, what happened. This isn't a situation where it's fortunate if the bullet just grazes the young man, it may be different. But somebody gets shot in the back of the head — and I know you didn't do it. I mean according to the facts here, you didn't do it personally, but, you know, that's a serious thing. Somebody has lost their life.

> "And remember, people do things. Mr. Brickey made an excellent comment. Both counsel made a lot of excellent comments, but one that I thought comes across a lot for me is, is the person who is doing the actions — in this case there's a name, Sert, or whatever the nickname is, going to the house. Would he be so bold as to go to the house or do what he's doing unless he had people backing him up? And that's where these gang things get so serious and so problematic is that people when they have groups are more bold … than when they don't and they are just out there by themselves.

7.

"So I have to consider those things, and I have to consider your involvement, and it's serious.… You wrote me good letters. I think you will be a success, and I am taking everything into account. I want you to know that. I'm taking your strong family support into account too.…

"And I will tell you that, you know, I prepare these cases. I always read them more than once. I always read things before sentencing for disposition. Night before, I read them, and I read them in the morning, and then I hopefully can come — and then I listen to everybody's comments. Sometimes I'll change my mind from what I was thinking before. Sometimes I don't.

"It's a very serious decision. I want you to know I've thought about it very much.… So my comments are with encouragement, but yet there is, of course, accountability, and I think there's nobody in the room who would think that there can't be accountability.

"And again, family members, if you are sitting there, think about if this was … Andres that had been killed, laying on the back of [*sic*] the street with a bullet in his head, how would you feel? How would you want a judge to respond to that and treat the young people involved?

"Okay. As I mentioned, I think Mr. Horowitz and Mr. Brickey were certainly fair and made extremely correct decisions in regard to this case.… [¶] … [¶]

"… I'm going to send you to DJJ. Okay. I don't say that lightly. I think you can benefit from it. I think that it's the only program out there that I think that has an adequate level of rehabilitation and accountability under these circumstances that we've discussed, but I'm not going to send you for the maximum term.… And it's not at all giving up on you or at all discounting what your family said or what the [*sic*] steps you've taken. You will come out of this if you take it with the right attitude in a positive fashion. I think you will.

"Okay. So I've went [*sic*] through a lot of the concerns as far as this matter in terms of the factors under [section] 731[, subdivision] (c). I have considered those facts and circumstances. I do take note that he does not have any prior record. I do take note also that in the report, it was referenced that [Andres] was not a gang member. He affiliated, backed up — however that may have been, but, you know, I think all the parties have said that he was not a validated gang member, and I did take that into account.

8.

"I do take into account also that he did not personally use a weapon, but a weapon was used. As I referenced earlier, the offense did involve just such a great violence, a great harm to another person, in fact the death of another person. It was cruel, vicious, and callous. That's a big factor.

"I do weigh these circumstances.… I've taken into account his very strong family support, … his progress in the Juvenile Justice Facility, and his overall prospects and interests."

Having weighed all the circumstances, the court elected to set the maximum period of confinement at five years, rather than the statutory maximum of nine years. It stated it had "strongly considered all less local restrictive programs and forms of custody" and was "fully satisfied" they were inappropriate dispositions and that Andres could benefit from the various programs provided by DJJ.[5]

## DISCUSSION

Andres contends the juvenile court erred by committing him to DJJ. While we agree the court reasonably could have eschewed a DJJ commitment in favor of some less restrictive alternative, this does not mean the court acted *un*reasonably.

An appellate court "reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision. [Citations.]" (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; accord, *In re Asean D.* (1993) 14 Cal.App.4th 467, 473.) "When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge. [Citation.]" (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65; see *In re Todd W.* (1979) 96 Cal.App.3d 408, 416.) Rather, the standard "asks in substance whether the ruling in question 'falls outside the bounds of

---

**5** The court also made other findings and orders, such as with respect to restitution and gang registration, that are not pertinent to the issue raised on appeal.

9.

reason' under the applicable law and the relevant facts [citations]." (*People v. Williams* (1998) 17 Cal.4th 148, 162.)

"A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.) To uphold a DJJ commitment on appeal, "there must be evidence in the record demonstrating both a probable benefit to the minor by a [DJJ] commitment and the inappropriateness or ineffectiveness of less restrictive alternatives. [Citations.]" (*In re Angela M.*, *supra*, 111 Cal.App.4th at p. 1396.) Where such evidence exists, a DJJ commitment is not an abuse of discretion (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250), even when the minor has not previously received a less restrictive placement (*In re Eddie M.* (2003) 31 Cal.4th 480, 488; *In re Asean D.*, *supra*, 14 Cal.App.4th at p. 473).

In determining whether the juvenile court acted arbitrarily or irrationally in ordering a DJJ commitment in a particular case, we assess the record, and evaluate the exercise of discretion, in light of the purposes of the Juvenile Court Law. (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395; see *In re Lorenza M.* (1989) 212 Cal.App.3d 49, 57-58.) "Under section 202, juvenile proceedings are primarily 'rehabilitative' (*id.*, subd. (b)), and punishment in the form of 'retribution' is disallowed (*id.*, subd. (e))" (*In re Eddie M.*, *supra*, 31 Cal.4th at p. 507); however, the law recognizes punishment as a tool of rehabilitation, and strives to provide for the protection and safety of the public as well as each minor under the juvenile court's jurisdiction (§ 202, subds. (a) & (b); *In re Asean D.*, *supra*, 14 Cal.App.4th at p. 473; *In re Michael D.*, *supra*, 188 Cal.App.3d at p. 1396).

In addition, in order for a minor to be statutorily eligible for a DJJ commitment, his or her most recent offense must be listed in subdivision (b) of section 707. (§ 733, subd. (c); see *In re D.B.* (2014) 58 Cal.4th 941, 944.) "The Legislature's primary purpose in enacting [section 733, subdivision (c)] was to reduce the number of juvenile offenders housed in state facilities by shifting responsibility to the county level '"for all

but the most serious youth offenders.'" [Citations.]" (*In re D.B.*, *supra*, at p. 948.) Andres admitted committing assault with a deadly weapon. Although not specifically enumerated, that offense has been held to be encompassed within subdivision (b)(14) of section 707, which lists "[a]ssault by any means of force likely to produce great bodily injury." (*In re Pedro C.* (1989) 215 Cal.App.3d 174, 182-183.) Andres thus falls within the group of juvenile offenders deemed most serious by the Legislature.

Turning to the record before us, it is apparent the juvenile court considered, as required by section 725.5, Andres's age and lack of previous delinquent history, and the circumstances and gravity of the offense.[6] (See *In re Gary B.* (1998) 61 Cal.App.4th 844, 848-849; *In re Tyrone O.* (1989) 209 Cal.App.3d 145, 152.) It also made the necessary findings with respect to the probable benefit Andres would receive from DJJ and the inappropriateness of less restrictive local programs. Andres says the record does not support the court's findings, but we disagree, particularly in light of the probation officer's explanation of the educational, gang awareness, and victim awareness classes and resources that would be beneficial to Andres and that were available at DJJ but not locally.[7] Andres points out that he was making significant progress while at JJC, but this was argued to the court, as was the fact local commitments are preferred under the law. We will not assume the court failed to consider these matters. (See *In re Ricky H.* (1981)

---

[6] Section 725.5 provides: "In determining the judgment and order to be made in any case in which the minor is found to be a person described in Section 602, the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history."

[7] Andres cites to various statistics and articles that, he contends, contradict the juvenile court's findings. Although available on the Internet, these matters were not presented to the juvenile court, and we question whether they are properly before us. In any event, they do not change our analysis or conclusion, as they merely afford an opportunity for a difference of opinion.

30 Cal.3d 176, 183-184.) Indeed, the record shows the court carefully considered all the information before it.

Andres argues, based largely on the trial court's statement that DJJ was "the only program out there that … has an adequate level of rehabilitation and accountability under [the] circumstances," and its asking Andres's family members how they would want a judge to respond if Andres had been the one killed, that the court impermissibly considered retribution for the victim. Permissible punishment under the Juvenile Court Law means the imposition of sanctions, but, as previously noted, does not include retribution. (§ 202, subd. (e).)

We do not read the court's comments or reasoning as indicating a retributive purpose or attitude. Holding Andres accountable for his misdeed while at the same time seeking to ensure he is rehabilitated is not the same as exacting a punishment in repayment for the victim's life.[8]

To summarize, the juvenile court considered all relevant factors prior to committing Andres to DJJ. The court's decision as to each factor was supported by the record. Accordingly, we find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

---

[8] Webster's Third New International Dictionary (1986) page 1843 defines "punishment" as, inter alia, "the infliction of a penalty." At page 1940, it defines "retribution" as, inter alia, "something given or exacted in recompense."

At least one Court of Appeal has concluded that, although a DJJ commitment is the most restrictive of dispositions available for juvenile wards, it does not amount to greater punishment. (*In re Edward C.* (2014) 223 Cal.App.4th 813, 825.)